889 A.2d 56

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Steven DUFFEY, Appellant.**

Supreme Court of Pennsylvania.

Submitted May 28, 2002.

Decided Dec. 28, 2005.

500

George S. Bobnak, Billy Horatio Nolas, Philadelphia, for Steven Lewis Duffey, appellant.

Amy A. Schwed, Kathleen M. Granahan; Amy Zapp, Harrisburg, Andrew John Jarbola, Scranton, for the Com. of PA.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Chief Justice CAPPY.

The instant case arose as an appeal from the denial of post-conviction relief under the Post Conviction Relief Act, 42 Pa.C.S. § 9541–46 ("PCRA"). We issued an opinion in this matter on August 18, 2004, affirming the guilt phase of

Appellant's trial. *Commonwealth v. Duffey,* 579 Pa. 186, 855 A.2d 764 (2004) (*"Duffey II"*).[1] We only reviewed one of Appellant's penalty phase issues and granted a limited remand for the PCRA court to conduct an evidentiary hearing on that issue. That hearing is now complete, and this court must review Appellant's penalty phase claims. For the reasons stated herein, we conclude that Appellant is not entitled to relief on his PCRA petition.

In *Duffey II,* this court was presented with a layered claim of ineffectiveness related to the testimony of the Commonwealth's rebuttal witness, Dr. John Hume.[2] After reviewing the relevant law, we believed that Dr. Hume's testimony unconstitutionally commented on Appellant's right to remain silent in violation of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). *Duffey II,* 855 A.2d at 774–75. "Relying on that expert testimony, the prosecutor then impermissibly referred to Appellant's silence and suggested damaging inferences from that silence." *Id.* at 775. Thus, the court concluded that Appellant's claim that trial counsel was ineffective for failing to object to Dr. Hume's comments and the prosecutor's closing arguments had arguable merit. *Id.* Likewise, we held that Appellant was prejudiced by the impermissible reference to his silence and the prosecutor's comment on his silence during his closing arguments. *Id.* We did not, however, deem defense counsel ineffective at that juncture, since we were unable to assess the reasonableness of trial counsel's actions. Accordingly, we remanded this matter for an evidentiary hearing. We also ordered that the hearing should encompass testimony related to appellate counsels'

1. The direct appeal in this matter is *Commonwealth v. Duffey,* 519 Pa. 348, 548 A.2d 1178 (1988) and will be referred to as *"Duffey I."*

2. During the penalty phase, Appellant presented mental health evidence in support of mitigation under 42 Pa.C.S. § 9711(e)(3) (the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired). In rebuttal, the Commonwealth presented Dr. Hume who testified, in relevant part, that Appellant was someone who had the capacity to make voluntary choices and that he was able to control his impulses and behavior. *Duffey II,* 855 A.2d at 772.

502

conduct, giving Appellant the opportunity to prove his "layered" claim of appellate counsel ineffectiveness.

The PCRA court held an evidentiary hearing on November 18, 2004 and issued findings from the bench. These findings subsequently were memorialized in an opinion dated December 15, 2004. The PCRA court found that trial counsel's strategy in failing to object to the unconstitutional comments was reasonable. The court, however, then concluded that appellate counsel was ineffective. The PCRA court's findings are now before this court, and it is now our responsibility to review those findings.

As a general proposition, an appellate court reviews the PCRA court's findings to see if they are supported by the record and free from legal error. *Commonwealth v. Reyes,* 582 Pa. 317, 870 A.2d 888, 893 n. 2 (2005). The court's scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party. *See, e.g., Commonwealth v. Meadius,* 582 Pa. 174, 870 A.2d 802, 2005 WL 711621 (2005).

Following *Duffey II,* the initial question with regard to this claim is related to the strategy of trial counsel. Counsel is presumed to have been effective. *Commonwealth v. Miller,* 572 Pa. 623, 819 A.2d 504, 517 (2002). "Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Id.* A claim of ineffectiveness generally cannot succeed through comparing, in hindsight, the trial strategy employed with alternatives not pursued. *Id.*

During the evidentiary hearing before the PCRA court, trial counsel gave a multitude of reasons for failing to object to Dr. Hume's testimony. Trial counsel's first line of reasoning in support of his failure to object to Dr. Hume's testimony was that he did not want to undermine either his credibility or line of communication with the jury by raising objections which would not be fruitful. N.T., 11/18/2004, at

81–82. Counsel pointed out that he repeatedly challenged the admissibility of Dr. Hume's testimony both before trial and before the penalty phase, and the trial court overruled each of these objections. *Id.* at 48–50, 52–53, 54. Additionally, counsel argued that he raised numerous objections to Dr. Hume's testimony, which were similarly overruled. *Id.* at 60. Therefore, according to counsel, he did not want to object to Dr. Hume's testimony and was afraid of undermining his credibility in front of the jury. *Id.* at 81–82. In response, PCRA counsel challenged trial counsel's testimony by asking him whether a specific constitutional objection would have been better than a general objection to Dr. Hume's testimony. *Id.* at 57. PCRA counsel also pointed out that after Dr. Hume's testimony regarding Appellant's silence, trial counsel raised additional specific objections to Dr. Hume's testimony. *Id.* at 87–91, 93–95. PCRA counsel therefore attempted to weaken trial counsel's testimony by demonstrating that trial counsel did not have a good reason not to object to Dr. Hume's testimony. The PCRA court, however, credited trial counsel's testimony that he did not object to Dr. Hume's testimony so as not to undermine his credibility with the jury and to maintain his line of communication with the jury.[3] Accordingly, as to this point, the PCRA court concluded that "it is the opinion of the court that a strategy where counsel attempts to maintain credibility with a jury in a death penalty case … has 'some reasonable basis designed to effectuate his client's interest.'" PCRA court opinion at 5.

Trial counsel's second line of reasoning in support of his failure to object to Dr. Hume's testimony was that he believed he could use Dr. Hume's testimony regarding Appellant's

---

**3.** The PCRA court also suggested that counsel's strategy was reasonable since the specific constitutional issue that we found meritorious was "already preserved," which implied that counsel raised a specific constitutional objection to Dr. Hume's testimony. While such a suggestion is inconsistent with our decision in *Duffey II*, when we found Appellant's claim to have arguable merit, *see* supra n. 3, we do not believe this finding to be of any moment, since the PCRA court clearly grounded its conclusion regarding counsel's strategy on its determination that counsel believed it was not in his client's best interest to raise additional objections to Dr. Hume's testimony.

silence to his advantage. *See* N.T., 11/18/2004, at 38–39, 41–43, 60. Specifically, he testified that he was going to offer that Appellant had a limited mental capacity. *Id.* at 66, 71–72. Trial counsel believed Dr. Hume's testimony regarding Appellant's silence was consistent with his argument that Appellant had limited mental capabilities, since he intended to show that Dr. Hume's testimony demonstrated that Appellant was not capable of answering the questions. *Id.* at 66–68, 72–73. PCRA counsel then challenged trial counsel's testimony by pointing out that he did not, in fact, pursue this line of cross-examination with Dr. Hume. *Id.* at 84–85. In response, trial counsel testified that "[Dr. Hume] was a very matter of fact positive witness. After having felt him out for a little while, I did not think I was going to get much out of him at all, okay." *Id.* at 69; *see also id.* at 85–6. The PCRA court credited trial counsel's testimony, finding that trial counsel "limited his cross-examination of Dr. Hume because he was a trained medical doctor and a lawyer. He believed that Dr. Hume would have been able to turn his answers to his questioning in such a way that it would result in a net positive for the prosecution." PCRA court opinion at 5. Again, the PCRA court credited counsel's testimony, making a legal determination that counsel had a reasonable basis for the strategy he pursued regarding Dr. Hume's testimony.

Lastly, PCRA counsel questioned trial counsel about his failure to object to the prosecutor's closing argument. PCRA counsel also pointed out that trial counsel raised numerous objections during closing arguments, but none to the reference to Dr. Hume's testimony. N.T., 11/18/2004, at 98–99. Counsel responded, "When I say I was concerned about my credibility with Hume, I didn't want to give the impression of hiding anything. There was nothing to hide. In the closing argument that you just referenced, my recollection is tenor or emotional aspects of it or such that I probably felt it wise to object to just get a break or to tone it down a little bit." *Id.* at 100. Once again, the PCRA court credited trial counsel's reasoning that trial counsel "wished to draw the jury's atten-

tion away from Dr. Hume's testimony to that of his own witnesses." PCRA court opinion at 5.

Based on our review of the record of the PCRA court's hearing, we conclude that the factual findings of the PCRA court are supported by the record and agree with the PCRA court's legal determination that counsel's strategy had some reasonable basis designed to effectuate his client's interest. *Miller, supra.* We reiterate that a claim of ineffectiveness generally cannot succeed through comparing, in hindsight, the trial strategy employed with alternatives not pursued. *Id.* Accordingly, we conclude that the PCRA court did not err in finding that counsel was effective, and we affirm the PCRA court's finding in this regard.

Having affirmed the determination by the PCRA court that trial counsel was effective, we will turn to the second part of this claim—the layered ineffectiveness claim. As noted previously, the PCRA court analyzed appellate counsels' conduct independently and found that the record demonstrated that the appellate counsel who prepared the brief was ineffective since he only analyzed issues related to the guilt phase of trial and did not prepare any arguments related to the penalty phase of the trial. Similarly, the appellate counsel who argued the case on appeal did not separately review the issues. Accordingly, the PCRA court concluded that Appellant presented sufficient evidence to establish that appellate counsel were ineffective for failing to pursue this issue on appeal.

As we explained in *Duffey II*, the instant issue arose as a layered ineffectiveness claim. Thus, as with all claims of ineffectiveness, the petitioner must establish that: (1) the underlying claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the petitioner suffered prejudice as a result of that counsel's deficient performance as to each prior counsel. *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014, 1023 (2003) (*citing Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 975 (1987)). The arguable merit prong of appellate counsel ineffectiveness is grounded in the underlying claim of trial counsel ineffectiveness. In order

for the claim related to appellate counsel's conduct to have arguable merit, a petitioner must prove the underlying claim of trial counsel ineffectiveness.

■ The discussion of Appellant's underlying trial counsel claim and our agreement with the PCRA court's conclusion that trial counsel had a reasonable basis for pursuing a certain strategy makes clear that Appellant has not proved his underlying claim of trial counsel ineffectiveness. Accordingly, he cannot prove the arguable merit prong related to appellate counsel ineffectiveness and no relief is due on this claim.[4]

■ Alternatively, Appellant argues that even if the PCRA court's findings regarding trial counsel were correct, appellate counsels should have raised this claim as a claim of trial court error under the then-applicable relaxed waiver doctrine. Appellant ignores that this court's relaxed waiver doctrine was discretionary, and thus, there was no guarantee that we would have analyzed this issue under the relaxed waiver doctrine. *See Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385, 400 n. 9 (2003). Accordingly, any reliance on this court's relaxed waiver doctrine is unavailing.

Having resolved the issue that was the subject of our remand in *Duffey II*, we must consider Appellant's remaining penalty phase issues, since in *Duffey II* we postponed review

4. Appellant also argues that the PCRA court's determination that appellate counsel was ineffective was proper because it found that trial counsel preserved the issue related to Dr. Hume's testimony, and thus, the PCRA court properly determined that appellate counsel was ineffective. Appellant is referring to the oral recitation of the findings of fact, when the PCRA court emphasized that trial counsel had "preserved" the issue related to Dr. Hume's testimony by making objections pretrial, immediately prior to the penalty phase, and immediately prior to Dr. Hume's testimony. N.T., 11/18/2004, at 150.

Appellant overlooks that the PCRA court's finding related to Dr. Hume's testimony generally and did not relate to the specific constitutional error that this court discussed in *Duffey II*. Moreover, there is no allegation that the trial court erred in admitting Dr. Hume's testimony generally. Rather, the allegation relates to specific testimony by Dr. Hume. As we held in *Duffey II*, this specific testimony was unobjected to by trial counsel, and thus, there can be no allegation of trial court error, i.e., that the trial court erred in overruling trial counsel's objection. We reiterate that appellate counsel cannot be ineffective if there was no error below.

of those issues until after the PCRA court issued its opinion on remand. Accordingly, we will now consider Appellant's remaining penalty phase challenges.[5]

Appellant first argues that trial counsel was ineffective for failing to adequately investigate and present mitigating circumstances to the jury. In support of his claim, Appellant raises five separate challenges to trial counsel's investigation, preparation, and presentation of mitigating evidence. The PCRA court held extensive hearings regarding Appellant's challenges and ultimately concluded that he was not entitled to relief. We now review the PCRA court's conclusion keeping in mind the standard of review set forth *supra*, 585 Pa. at pages 501–03, 889 A.2d at page 61.

Appellant attacks trial counsel's failure to uncover information related to the fact that Appellant lived in an EPA Superfund area from ages three to nine. The site was declared to be a Superfund site in 1983 and was known, at that time, to contain toxic elements, including lead. Additionally, PCRA counsel uncovered anecdotal evidence from Appellant's mother that Appellant ate paint chips. According to experts presented by Appellant during the PCRA hearing, exposure to lead could have caused Appellant's organic brain damage.

The PCRA court concluded that Appellant's claim failed since he never established that the facts and circumstances to be investigated were within counsel's knowledge. We agree. While counsel must undertake a reasonable investigation, there was no reason for counsel to conceive that Appellant had ever been exposed to lead, other than the fact that Appellant lived in a town that was declared to be a Superfund site in 1983. *See Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767 (2004) (indicating that counsel's ineffectiveness for failure to investigate depends upon a myriad of factors including the mitigation evidence that was actually presented, the reasonableness of counsel's investigation, and the mitigation evidence that could have been presented). As noted by the PCRA

5. As we explained in *Duffey II*, the instant case is governed by the statute in existence prior to the 1995 amendments to the PCRA.

court, there is no allegation by any family member that they even knew at the time of Appellant's trial that Appellant had been exposed to lead. Furthermore, there were no childhood medical reports documenting that Appellant had high levels of lead in his blood.[6] Accordingly, we affirm the PCRA court's conclusion with regard to Appellant's first challenge.

Appellant next points to trial counsel's failure to investigate, prepare, and present mitigating evidence from family witnesses. While Appellant acknowledges that relevant mitigating evidence was presented by Appellant's mother and sister at the penalty hearing, he challenges the quality and quantity of this evidence. Specifically, Appellant offers that the evidence did not adequately establish Appellant's poverty-stricken childhood, the extreme mental and physical abuse he suffered at the hands of his father, his exposure to toxic chemicals, his poor performance at school, and the development of his mental and emotional disorders.

At the penalty phase trial counsel presented the testimony of Appellant's mother, sister, and a school counselor for evidence of Appellant's childhood history in support of the catch-all mitigator, 42 Pa.C.S. § 9711(e)(8). Appellant's mother testified to the family's financial circumstances, including that she was the breadwinner of the family and that Appellant's father was "rarely employed." N.T., 2/7/1985, at 137–39. Moreover, regarding physical abuse, she testified that Appellant's father was being treated for schizophrenic tendencies during Appellant's childhood, which made him unpredictable, and that "we didn't know if we were going to be abused that day or if we weren't going to be. Anything ticked him off."

6. Indeed, even assuming that counsel should have miraculously deduced the fact that Appellant lived near a Superfund site during his early years, and that such a fact meant that he had possibly been exposed to lead, expert testimony adduced at the PCRA hearing was unclear as to whether the technology existed at the time of trial which would have established Appellant's childhood exposure to lead. See N.T., 12/13/1999, pp. 180–2 (Dr. Rosen's expert testimony on cross-examination indicating that "blood leads" could not have established how much lead in his blood in 1984 was from Appellant's exposure to the Superfund site and that the current technology for assessing past lead exposure was unavailable in the United States in 1984).

*Id.* at 140. She gave specific examples of abuse, including that "[the children] had their clothes pulled off them, and they were beaten with belts, with the buckle part." *Id.* Mrs. Duffey also testified that Appellant's father abused her sexually and physically and that the children observed the abuse. *Id.* Additionally, she testified that Appellant "got it the worst." *Id.* at 141. Mrs. Duffey testified regarding Appellant's physical traumas, including that he accidentally ingested Thorazine when he was 1½ to 2 years old, *id.* at 145–46; that he "cracked his head" in a bicycle accident for which he received butterfly sutures at the hospital, *id.* at 146; and that he began to have "seizures" when he was nine for which he received medical treatment. *Id.* at 147. Appellant's sister also testified as to the beatings the children regularly received at the hands of their father, *id.,* at 152; and that Appellant "got the worst of all of the beatings." *Id.* Lastly, the school counselor presented various school records in support of his testimony and testified that Appellant's school performance was poor, *id.* at 55–56, 59, that Appellant had both academic and disciplinary problems at school, *id.* at 57, and that Appellant received counseling for mental health and/or mental retardation and was encouraged to continue such counseling "because of the difficulties he was experiencing." *Id.* at 58.

After reviewing Appellant's challenge, the PCRA court concluded that trial counsel presented adequate testimony of Appellant's childhood. We agree with this conclusion. Based upon the testimony that was presented at the penalty phase hearing, Appellant has not established that counsel was ineffective in presenting mitigation evidence of Appellant's childhood. Appellant's argument regarding trial counsel's alleged deficiencies is directed at the quantity and quality of the same type of testimony that was offered in support of the catchall mitigator. Appellant does not offer that there was different evidence that could have been presented in support of the mitigating factor,[7] but merely asserts that more evidence of

7. The only exception to this statement is the evidence of Appellant's exposure to lead. That issue, however, has been addressed previously and there is no reason to revisit it under this claim.

Appellant's dysfunctional childhood could have been offered. Appellant's argument overlooks that we must examine his claim, based upon a myriad of factors, including the testimony actually presented and the testimony that could have been presented. *Malloy, supra.* When examining the evidence in this light, Appellant has not established that counsel was ineffective.[8]

With respect to the remaining arguments regarding mitigating evidence, Appellant is challenging trial counsel's presentation of mitigating evidence to the jury during the penalty phase. As such, the focus of our review of these challenges will be on the reasonableness of trial counsel's presentation of mitigating evidence under the standard set forth *supra*, 585 Pa. at pp. 501–03, 889 A.2d at p. 61. *See Miller, supra.*

Appellant argues that trial counsel did not assist the jury in understanding the connection between Appellant's life history and his behavior at the time of the offense. In support of his argument, at the PCRA hearing, Appellant offered numerous experts to testify that Appellant suffered from organic brain damage and that there was extensive evidence in support of such a diagnosis at the time of the penalty phase hearing. Appellant does not argue that trial counsel did not have such information in his possession, but takes issue with the direction the defense experts' testimony took, arguing that there was evidence of organic brain damage, mental illness, psychological deficiencies, physical abuse, and intellectual impairment, which the jury never heard. Further, Appellant contends that counsel failed to elicit testi-

---

**8.** Appellant also argues that trial counsel "rushed" through his mother's testimony and his mother should have testified regarding Appellant's poor school performance. In response to Appellant's allegations, at the PCRA hearing, trial counsel testified that Appellant's mother "was not a good witness. She just talked too much. That's just her nature. There's nothing she could do about it." N.T., 12/17/1999, at 60. He further testified that he did not question Appellant's mother regarding Appellant's school history because "[t]he mother was not, she just had a tendency to ramble and could go from different areas—you had to be very careful in talking to her." *Id.* at 62–63. Lastly, because we find counsel's presentation of mitigation evidence in support of the catchall mitigator adequate there is simply no reason to examine the preparation of these witnesses.

mony from the experts that would have demonstrated that anti-seizure medications have adverse side effects. He alleges that such deficiencies in counsel's conduct were compounded by trial counsel's decision to focus on the fact that Appellant was "antisocial," which informed the jury of all of the negative personality traits associated with an antisocial or sociopathic personality disorder.

During the penalty phase hearing, trial counsel offered the testimony of four experts in support of the two mental health mitigators. *See* 42 Pa.C.S. § 9711(e)(2) (the defendant was under the influence of extreme mental or emotional disturbance) and 42 Pa.C.S. § 9711(e)(3) (the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired). Two experts, Doctors Homayoon Froozan and Robert P. Brundage, testified as to Appellant's seizure disorder and two experts, Doctors Charles Brennan and John P. Lesniak, testified as to Appellant's mental health. Doctors Brennan and Lesniak acknowledged the possibility that Appellant suffered from some type of organic brain disorder, but their testimony focused largely on Appellant's antisocial personality disorder. *See* N.T., 2/7/1985, at 78–79 (Dr. Brennan testifying that he diagnosed Appellant with "organic personality syndrome or disorder"); *id.* at 83 (Dr. Brennan testifying that he also diagnosed Appellant with an anti-social personality); *id.* at 162 (Dr. Lesniak stating that there was a possibility of organic impairment). Dr. Brennan also utilized Appellant's childhood history in formulating his diagnosis, acknowledging that there was evidence of abuse, learning problems, disciplinary problems, and epilepsy. *Id.* at 158–59.

At the PCRA hearing, as noted above, Appellant presented extensive expert testimony in support of his contention that evidence existed at the time of the penalty phase hearing that demonstrated that Appellant suffered from organic brain damage. Furthermore, the expert testimony suggested that such brain damage was exemplified by Appellant's poor school performance, his feelings of isolation, and his seizure disorder,

and was exacerbated by the physical abuse Appellant suffered during his childhood.

In response, trial counsel testified regarding the presentation of Doctors Brennan and Lesniak's testimony during the penalty phase hearing. Trial counsel explained that from the outset, he wanted to focus on the seizure disorder and Appellant's competency. Both experts he secured, however, "determined without any hesitation that [Appellant] was competent to stand trial." N.T., 12/17/1999, at 33; *id.* at 67. Trial counsel also testified as to his meetings with Dr. Brennan, after Dr. Brennan had reviewed Appellant's case, supporting materials, and the statutes regarding aggravating and mitigating circumstances. He testified that they focused on Appellant's epilepsy and the physical abuse. *Id.* at 67. Further, Dr. Brennan told him that he could diagnose Appellant with organic brain syndrome, but that ultimately, "[Dr. Brennan] said it isn't going to help you at all." *Id.* at 68. Dr. Brennan explained to trial counsel that he felt the proper diagnosis was "personality disorder, antisocial personality." Trial counsel further testified as to his discussions with Dr. Brennan and how his diagnosis would be helpful during the penalty phase:

I discussed how I could use that diagnosis, that evidence, in terms of the case, and he explained what he could say and he could not. The good part was you could say in front of the jury that it was classified as a mental illness. The good part was that it would relate to things that happened to him as a child that he was not responsible for. He couldn't help it that his father was mean and his economic circumstances.

*Id.* at 69. Trial counsel related that Dr. Brennan told him he could testify as to "organic brain syndrome," but that "it wouldn't mean anything because in his interpretation whatever had occurred to this individual did not affect his thought or cognitive processes." *Id.* at 71. Regarding the epilepsy, counsel remembered Dr. Brennan telling him that "it's in the wrong place," implying that it was not relevant to the mitigating circumstances. *Id.* at 77–78. Lastly, with regard to Dr. Lesniak's testimony, trial counsel testified that "Lesniak was reluctant to state anything other than a personality, organic

personality disorder which, you know, was not going to be as helpful as I wanted." *Id.* at 74. Thus, based upon his discussions with Doctors Brennan and Lesniak, counsel believed that he had no other choice, but to focus on the antisocial personality diagnosis, since at the very least it would give him the opportunity "to back door an additional element of [Appellant's] mental capacity" in order to raise a question in the jury's mind. *Id.* at 79.

The PCRA court credited trial counsel's testimony and ultimately concluded that "the fact that the appellant had found experts who now claim he has brain damage does not negate the fact that his trial counsel investigated his cognitive abilities and discussed it with the trial experts." PCRA court opinion, 12/19/2000, at 23–24. Accordingly, the court concluded that counsel acted with a reasonable trial strategy in presenting mental health evidence. We agree.

In *Commonwealth v. Rompilla,* 554 Pa. 378, 721 A.2d 786 (1998),[9] the appellant mounted a strikingly similar argument. In *Rompilla,* the defense hired three experts who diagnosed the appellant as a sociopath, but not as being brain damaged. Thus, trial counsel did not present any mental health mitigating evidence at trial. Following his trial, the appellant found additional experts willing to testify that he had brain damage. This court concluded that "the fact that Appellant now has found two experts who conclude that he has brain damage does not negate the fact that trial counsel investigated Appellant's cognitive abilities with other experts." *Id.* at 790.

Similar to the situation in *Rompilla,* trial counsel investigated the possibility of presenting mental health mitigators to the jury. In fact, trial counsel in this case did much more than the counsel in *Rompilla,* since in this case, trial counsel obtained the relevant records, gave them to the experts, and actually presented evidence in support of the mental health mitigators. Based upon counsel's testimony

9. The United States Supreme Court subsequently granted a writ of habeas corpus in *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), on the basis of trial counsel's failure to examine the appellant's criminal file of prior conviction for rape and assault.

514

regarding the information he supplied to the experts and his subsequent meetings with the experts, we simply cannot conclude that counsel's strategy was unreasonable.[10, 11]

■ Appellant next argues that counsel was ineffective in the manner in which he presented the testimony of Thomas Gilhooley, a prison social worker. At the penalty phase, Gilhooley testified to the fact that Appellant told him details about the murder and then described the details of the murder that Appellant related to him. During closing arguments, trial counsel referred to different conversations Appellant had following the murder with various individuals, including Appellant's statements to Gilhooley, and argued that such statements were "corroborative of a type of impulsive, lack of conscious (sic) individual that we suggest that this individual is." N.T., 2/7/1985, at 233.

Appellant now argues that the testimony elicited from Gilhooley was extremely harmful, since it highlighted the details of the crime. At the PCRA hearing, trial counsel explained that he put Gilhooley on the stand in order to contradict the Commonwealth's argument that Appellant killed the victim because he did not want to go back to jail. Trial counsel's position was that if Appellant did not want to go back to jail, he would not have confessed six times shortly after the murder. N.T., 12/17/1999, at 81. Appellant's statement to Gilhooley was evidence of an additional confession, and counsel pursued this line of inquiry to demonstrate Appellant's confused mental state. *Id.*

10. Moreover, with regard to Appellant's claim that trial counsel did not adequately present or elicit testimony that anti-seizure medication had adverse side effects, there is nothing to suggest that such testimony would have changed the diagnosis by Dr. Brennan or Dr. Lesniak, both of whom were fully aware of Appellant's condition and the fact that he was taking medication.

11. Appellant also argues that counsel did not adequately challenge the Commonwealth's case, largely on the basis of the availability of mental health evidence. As discussed above, however, counsel performed reasonably with regard to the information he had at the time of the penalty phase and we will not employ a hindsight evaluation of counsel's performance. *Miller, supra.*

The PCRA court credited counsel's testimony, concluding that counsel acted in his client's best interest, since he used Gilhooley's testimony to raise questions about Appellant's mental state. PCRA court opinion at 25. Again, we agree with the PCRA court's finding. We reiterate that "counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Miller, supra.*

 Lastly, Appellant argues that trial counsel's statements during closing arguments were weak, ineffective, and harmful, and painted Appellant as a "frightening, anti-social person without a conscience whose behavior was unexplainable." Appellant's Brief at 50. In support of his argument, Appellant directs our attention to comments made by trial counsel during closing arguments, when he stated that: "[Appellant] has a personality disorder, lacks conscience, doesn't have a conscience"; "if you believe our testimony, people like this cannot be deterred"; "[Appellant] . . . can't be treated"; "consider also, most important the fact that he said he felt better because he might do it to his own family next time"; "he doesn't even know he has a damn problem." N.T., 2/7/1985, at 225, 230, 233–34.

During the PCRA hearing, counsel testified that his defense strategy was to raise the question of whether Appellant was "in his right mind." N.T., 12/17/1999, at 87. Again, the PCRA court credited counsel's testimony and concluded that trial counsel's focus during closing arguments was to highlight the mental health issues and that counsel acted "in the best interest of his client." PCRA court opinion at 27.

While this court would not go so far as to conclude that counsel acted in the "best interest" of Appellant, we agree that this claim is meritless. Notably, Appellant takes these comments out of context, and when read in context, it is clear that counsel was attempting to communicate to the jury that Appellant had a personality disorder and that the personality disorder made him act impulsively. Furthermore, counsel implied that jail was the best place for Appellant, since "the

death penalty is not going to deter another individual like Mr. Duffey from acting in the same fashion. It simply is not the proper remedy, because if you believe our testimony, people like that cannot be deterred." N.T., 2/7/1995, at 225. Accordingly, counsel's closing arguments were consistent with his stated purpose of highlighting to the jury Appellant's mental health issues, and we agree with the PCRA court that such a strategy was reasonable.

Having reviewed Appellant's allegations regarding counsel's performance in presenting mitigating evidence, we turn to Appellant's remaining penalty phase claims. Appellant asserts that the penalty phase was tainted by victim impact evidence and points out that at the time of Appellant's trial, victim impact evidence was inadmissible. *Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130 (1996).

While Appellant correctly argues that the 1995 amendment to the death penalty statute permitting victim impact evidence "applies only to sentences imposed for offenses which took place on or after" the effective date of the amendment, *id.* at 145 n. 7, Appellant overlooks that we have indicated that it was not until *Fisher* that this court explicitly held, for the first time, that victim impact testimony was inadmissible at the penalty phase. *Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 939 n. 3 (2002). *Fisher*, however, was decided after Appellant's direct appeal was final, and Appellant cannot rely on that case to support claims made in a collateral appeal such as the one presented here. *Id.* Moreover, Appellant did not raise and preserve a challenge to victim impact evidence on direct appeal. Accordingly, this issue does not entitle Appellant to relief.

Appellant next argues that the trial court erroneously instructed the jury that it should weigh the sole aggravating circumstance against each mitigating circumstance individually, rather than against the collective weight of all of the mitigating circumstances. According to Appellant, such an

instruction was contrary to our decision in *Commonwealth v. DeHart*, 539 Pa. 5, 650 A.2d 38 (1994).[12]

In *DeHart*, the verdict slip informed the jury that the aggravating circumstance was to be weighed against the mitigating "circumstance," even though more than one mitigating circumstance was presented to the jury. *Id.* at 48. We held that the appellant's trial counsel was ineffective for failing to object to the instructions, which failed to track the statutory language in 42 Pa.C.S. § 9711(c)(1)(iv) (requiring that "the verdict must be a sentence of death if the jury unanimously finds ... one or more aggravating circumstances which outweigh any mitigating circumstances"). We granted the appellant relief, because the verdict slip could have erroneously led the jury to weigh the sole aggravating circumstance against each mitigating circumstance individually, rather than collectively. *Id.* In doing so, we stressed that it was the error in the written jury instructions that compelled such a result, because when "the jury is required to rely upon the oral instructions given by the judge in his charge, if disagreement arises concerning the oral instructions, it is more likely that the jury would seek further instructions from the judge to resolve the question.... On the other hand, when a jury is left to its own devices to interpret a written instruction, the possibility of a misconception is significantly enhanced." *Id.*

In this case, Appellant acknowledges that the written instructions on the verdict slip correctly communicated the law to the jury, but contends that such a fact should not be deemed to correct the oral instructions, which did not properly communicate the law under Section 9711(c)(1)(iv) to the jury. Appellant conveniently ignores that our decision to award relief in *DeHart* was a result of the fact that the written

12. While *DeHart* was decided after the sentence was imposed in the instant case, we have indicated that there is a difference between the failure to anticipate a "change in the law" and the failure of counsel to vindicate his client's rights under existing statutory provisions. *See Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761, 795 n. 36 (2004). Thus, in this case, as the alleged basis for relief arises out of a statute that existed at the time of Appellant's conviction and sentence, we will analyze the merits of the issue, rather than simply dismissing it on the basis of counsel's failure to anticipate a change in the law.

instructions were erroneous, since such an error could have led the jury to fail to obtain clarification from the court if disagreement arose regarding the correct interpretation of the language. In this case, however, the written instructions on the verdict slip correctly communicated the law to the jury. Accordingly, this issue is without merit.

Appellant next argues that the penalty phase jury instructions erroneously suggested that the jury must unanimously find a mitigating circumstance in violation of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

As we recently explained in *Commonwealth v. Cox*, 581 Pa. 107, 863 A.2d 536, 554 (2004), an alleged *Mills* violation will not be available on collateral review in cases in which the alleged error occurred before the United States Supreme Court's decision in *Mills*.[13] In this case, the allegedly erroneous instruction was given in 1985, well before the Court's decision in *Mills*. This court affirmed Appellant's conviction on direct appeal on October 14, 1988, which was after the High Court's decision in *Mills*. Appellant, however, never raised or preserved a *Mills* claim before the trial court or on direct appeal. As such, Appellant's claim regarding *Mills* is waived. *Cox, supra.*

Like the appellant in *Cox*, Appellant attempts to overcome waiver by raising a layered claim of counsel's ineffectiveness. Trial counsel, however, will not be deemed ineffective for failing to anticipate a change in the law. *Id.* Accordingly, trial counsel was not ineffective for failing to anticipate the *Mills* decision, and thus, Appellant's layered claim necessarily fails.

Appellant next argues that the trial court erred in failing to instruct the jury that life in prison means life without the possibility of parole in violation of *Simmons v. South*

---

**13.** *Our decision in* Cox *also explains the impact of the United States Supreme Court's decision in* Beard v. Banks, *542 U.S. 406, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004), and we see no reason to reiterate that discussion herein.* See Cox, *863 A.2d at 554.*

*Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). At the time of Appellant's trial, however, *Simmons* had not been decided and the law in Pennsylvania prohibited juries from being informed that "life means life." *Commonwealth v. Santiago*, 579 Pa. 46, 855 A.2d 682, 700–01 (2004). Indeed, we have explained that "Simmons will not be given retroactive effect in a collateral attack upon a petitioner's sentence." *Id.* (citing *Commonwealth v. Laird*, 555 Pa. 629, 726 A.2d 346, 360 (1999)). Accordingly, this issue does not entitle Appellant to relief.

Lastly, Appellant raises a challenge to the proportionality review this court conducted on direct appeal.[14] Specifically, Appellant argues that the procedures used to conduct the proportionality review in his case were defective and did not comport with the statutory requirement, 42 Pa.C.S. § 9711(h)(3)(iii). In order to conduct the proportionality review effectively, Appellant contends that the information that the proportionality review is based on must be accurate. In this case, according to Appellant, our proportionality review was based on the erroneous assumption that the jury found one aggravating circumstance and no mitigating circumstances, when, in reality, the verdict slip reflects that the jury found at least one mitigating circumstance.

The statute governing proportionality review in effect at the time of Appellant's direct appeal provided that "[t]he Supreme Court shall affirm the sentence of death unless it determines that ... the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." 42 Pa.C.S. § 9711(h)(3)(iii). This subsection was repealed in 1997, but continues to apply in those cases in which the sentence of death was imposed prior to the effective date of the repeal. *See Commonwealth v. Edmiston*, 578 Pa. 284, 851 A.2d 883, 900 n. 11 (2004). In this case, Appellant's sentence of death was imposed in 1985, well before the effective date of the repeal.

---

14. This is not raised as a claim of ineffectiveness as Appellant is attacking this court's decision on direct appeal.

As Appellant acknowledges, this court has held that issues challenging the proportionality of a capital sentence are previously litigated on collateral review, since we fully considered the issue on direct appeal. *See Edmiston*, 851 A.2d at 900. Appellant, however, is not attacking the method that this court used in conducting proportionality review but, rather, is attacking the accuracy of the facts that were relied upon in this court's direct appeal. Thus, Appellant's challenge could not have arisen until after this court's direct appeal when we relied upon allegedly inaccurate facts in conducting the proportionality review, and it would be improper to dismiss Appellant's claim as previously litigated. Rather, the question we must answer in this case is simply whether a claim challenging the accuracy of proportionality review is cognizable within the pre–1995 version of the PCRA and whether Appellant's claim, if cognizable, entitles him to relief.

Under the pre–1995 version of the PCRA, in order to be entitled to relief, the burden was on the petitioner to establish that the conviction or sentence resulted from "a violation of the Constitution of Pennsylvania or laws of this Commonwealth ... which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2).

In this case, we agree with Appellant that in order to meet the mandate of 42 Pa.C.S. § 9711(h)(3)(iii), the facts relied upon by this court in conducting the proportionality review must be accurate. Moreover, we agree with Appellant that there is at least a reasonable presumption that this court did not meet this mandate in this case.

The relevant discussion in our opinion on direct appeal, states:

IV. PROPORTIONALITY REVIEW

Finally, it is the practice of this Court to conduct a proportionality review of each case in which the death penalty is imposed. Our review focuses on whether the sentence of death is excessive or disproportionate to the penalty im-

posed in similar cases considering the circumstances of the crime and the character of the defendant. 42 Pa.C.S. § 9711(h)(3)(iii). **The jury found one aggravating circumstance and no mitigating circumstances in this case.** Therefore, a death sentence was imposed.

Our review indicates that **where the aggravating circumstance found was that the killing was committed while in perpetration of a felony, and no mitigating circumstances were found,** the death penalty has been imposed in the overwhelming majority of cases.

*Duffey I,* 548 A.2d at 1190–91 (citations and footnotes omitted) (emphasis added). The verdict slip that accompanied the death sentence, however, reflected that the jury found "one or more aggravating circumstances which outweigh any mitigating circumstances." On its face, it appears that this court relied on erroneous information in conducting our proportionality review on direct appeal, since the verdict slip indicated that the jury found at least one mitigating circumstance.[15] Thus, for purposes of the instant appeal, we will presume that there was a violation of the "laws of this Commonwealth," since we did not accurately consider "the circumstances of the crime" as required by § 9711(h)(3)(iii).

Proceeding from this assumption, however, does not answer the question of whether this error entitles Appellant to relief, since we must also resolve whether the "error so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place" and whether the sentence of death "resulted from" this error. 42 Pa.C.S. § 9543(a)(2).

We have indicated that claims arising during the penalty phase of a death case implicate the truth determining

15. The record reflects that the court clerk read back the verdict slip to the jury, including that it found "one or more aggravating circumstances which outweigh any mitigating circumstances," and the jurors agreed that this was a correct statement of the verdict. N.T., 2/7/1985, at 263. The record, however, like the verdict slip, does not reveal what mitigating circumstances the jury found, and we will not speculate as to what the jury actually found and instead, will rely on a common sense reading of the direct appeal opinion and the verdict slip.

process, *see Commonwealth v. Chester,* 557 Pa. 358, 733 A.2d 1242, 1249 (1999), and that claims arising during direct appeal are similarly cognizable under this rubric, since such claims were cognizable on traditional habeas corpus review. *See Commonwealth v. Lantzy,* 558 Pa. 214, 736 A.2d 564, 569–70 (1999). Thus, we cannot simply deny Appellant's claim on the basis that it was not directly related to the conviction, i.e., the guilt or innocence of Appellant. Rather, this court is the final arbiter of any disputes arising in a death penalty case and has the ultimate responsibility for affirming or reversing a sentence of death. 42 Pa.C.S. § 9711(h). At the time of Appellant's direct appeal, that responsibility included reviewing Appellant's sentence of death and affirming such a sentence only when we deemed it "proportional."

In this case, we cannot simply turn the clock back and speculate as to what was in the court's mind at the time it affirmed Appellant's sentence of death on direct appeal. We need not engage in such speculation, however, since we can perform the necessary proportionality review at the present time, based on the aggravating circumstances found by the jury and the mitigating circumstances presented to the jury.[16] Upon such review, we are confident that Appellant's sentence of death was proportional, and thus, cannot conclude that the sentence of death was a result of this court's alleged error in the direct appeal.

Accordingly, for the reasons stated herein, Appellant is not entitled to relief on his PCRA petition.

Justice NEWMAN and Justice BAER join the opinion.

Justice CASTILLE files a concurring opinion in which Justice EAKIN joins.

---

**16.** At the time of Appellant's sentence, the proportionality review was performed using the mitigating circumstances presented. *See Commonwealth v. Zook,* 532 Pa. 79, 615 A.2d 1, 18 (1992); *Commonwealth v. DeHart,* 512 Pa. 235, 516 A.2d 656, 669 (1986). Accordingly, the fact that the verdict slip does not reflect the mitigating circumstances actually found by the jury does not hinder our proportionality review.

Justice NIGRO concurs in the result.

Justice SAYLOR files a dissenting opinion.

Justice CASTILLE concurring.

I join the Majority Opinion with the exception of the three points set forth below.

First, the Majority addresses the merits of appellant's claim of trial court error premised upon *Commonwealth v. DeHart,* 539 Pa. 5, 650 A.2d 38 (1994), as well as appellant's claim of trial court error premised upon a failure to issue a jury charge based on *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), as if they were preserved claims of trial court error available on PCRA review. *See* Majority, 585 Pa. at 516–19, 517–21, 889 A.2d at 70–71, 71–72. Neither *DeHart* nor *Simmons* was decided at the time the trial court instructed the jury in this case, and appellant did not anticipate them. As claims of trial court error, these belated contentions are waived and unavailable under the PCRA. To the extent appellant raises derivative claims of ineffective assistance of counsel, the claims fail because they clearly lack even arguable merit.

Second, with respect to the claim premised upon *DeHart,* in a footnote (though not in its substantive analysis) the Majority appears to recognize that the claim may be viewed through the guise of ineffective assistance of counsel. The Majority then suggests that an ineffectiveness claim premised upon *DeHart* is available to appellant even though the *DeHart* case did not exist at the time when counsel would have had to raise the objection because there is a distinction between failures to anticipate a change in the law and failures to vindicate statutory rights. *See* Majority op., 585 Pa. at 517 & n. 12, 889 A.2d at 70 & n. 12 (*citing Commonwealth v. Hughes,* 581 Pa. 274, 865 A.2d 761, 795 n. 36 (2004)). The footnote in *Hughes* which the Majority invokes in support of this rather simplistic view was written as a responsive repudiation of a point I made in my separate opinion in that case. *See id.* at 818–19 (Castille, J., joined by Eakin, J., concurring and dissenting). *Hughes,* however, does not stand for the broad proposition that counsel

may always be faulted for failing to anticipate any and all future judicial interpretations of a statute. Even accepting *Hughes'* responsive proposition as a starting point, the analysis in any particular case must depend upon considerations including the clarity and lack of ambiguity in the statutory provision; previous interpretations (if any) of the provision; and the mode of analysis set forth in the subsequent opinion/interpretation the defendant invokes—*i.e.* a first interpretation, unanimous plain language reading is more likely to provide a basis for finding an ineffective "failure to vindicate" than is a reading which is bottomed upon statutory construction, over a dissenting opinion, and disapproving a prior construction. In short, whether counsel can be deemed ineffective in such an instance depends upon the circumstances; it is not an absolute.

As an example of the necessity for judicial construction of a statute before its proper interpretation may be deemed knowable and enforceable, one need only consider the Third Circuit's refusal to honor the state procedural default arising from the plain language of the PCRA's jurisdictional time-bar provision. The time-bar was adopted by the General Assembly in 1995 (taking effect in January 1996) and in the very first case in which this Court considered the new bar, we held that the plain language of the statute made clear that it was jurisdictional. *See Commonwealth v. Peterkin,* 554 Pa. 547, 722 A.2d 638 (1998). However, despite recognizing that the time-bar appeared "on its face to impose a one-year deadline in all cases except those falling within three categories," the Third Circuit subsequently found that the statute could not be deemed to mean what it plainly said (for purposes of deferring to the time-bar as an adequate and independent state procedural default) until this Court had passed upon it a few more times and made clear that we would enforce *its* plain terms. *See Bronshtein v. Horn,* 404 F.3d 700, 708 (3d Cir.2005) *(applying Fahy v. Horn,* 240 F.3d 239, 245 (3d Cir.2001)). The Third Circuit experience proves the error of the simplistic approach to statutory interpretation suggested by the Majority.

Third, with respect to appellant's claim of defective proportionality review on direct appeal, I write separately to make some additional points. At the outset, it is important to emphasize that this is not a claim rising to either federal or state constitutional dimension. Indeed, at least since the U.S. Supreme Court's decision in *Pulley v. Harris,* 465 U.S. 37, 49–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), it has been clear that proportionality review was not a constitutional requirement, but instead was a "constitutionally superfluous" exercise deriving from a statute which was drafted by the General Assembly in understandable concern that such review might be constitutionally required by the U.S. Supreme Court in its mercurial capital jurisprudence. Unfortunately, proportionality review was not timely removed from the Pennsylvania death penalty statute following the decision in *Pulley.* Thus, assuming that a claim of defective proportionality review has not been waived or previously litigated, it is cognizable under the version of the PCRA which governs this appeal only as a state-law claim deriving from a statute. *See* 42 Pa.C.S. § 9543(a)(2) (subsequently amended and replaced).[1]

It is also unclear whether this claim has been waived. The predicate for the claim is that this Court's opinion on direct appeal misapprehended the facts relevant to proportionality review. Under the version of the PCRA which governs here, an issue was deemed waived "if the petitioner failed to raise it and if it could have been raised before the trial, at the trial, on appeal, in a habeas corpus proceeding or other proceeding actually conducted or in a prior [PCRA] proceeding." *See* 42 Pa.C.S. § 9544(b) (subsequently amended and replaced). If this Court misapprehended the governing facts for purposes of proportionality review, appellant had an opportunity to seek timely relief, and accurate proportionality review, via a rear-

1. In 1995, the General Assembly amended the PCRA cognizability provisions; it no longer authorizes review of state law claims which are not of constitutional dimension. *See* 42 Pa.C.S. § 9543(a)(2)(i) (PCRA now recognizes claims involving "[a] violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.").

gument petition. *See* Pa.R.A.P. 2543 (setting forth considerations governing allowance of reargument; and specifically included as an example of "the character of the reasons which will be considered: ... Where the court has overlooked or misapprehended a fact of record material to the outcome of the case."). That appellant did not do so suggests, at a minimum, that his appeal counsel, who was in the best position to assess the accuracy of this Court's review, was satisfied with the result.

Finally, and on a related note, to the extent that the record is unclear these many years later concerning whether this Court relied upon erroneous information in conducting its proportionality review, that ambiguity weighs against appellant, as he bears the burden under the PCRA. In addition, appellant must show that the supposed factual error on direct review "so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place" and that the sentence of death "resulted from" this error. 42 Pa.C.S. § 9543(a)(2)(i). Thus, the PCRA rationally presumes the validity of concluded proceedings, and it rightly places the burden squarely upon the petitioner to demonstrate his entitlement to relief, which includes a prejudice component. Because appellant has not proven that his sentence was in fact disproportionate, and would have been found so upon the facts he prefers, he is entitled to no relief. Given these circumstances, I believe that the supplemental proportionality review engaged in by the Majority affords appellant more than his due.

Justice EAKIN joins this concurring opinion.

Justice SAYLOR dissenting.

I respectfully dissent, as I would remand to the PCRA court for clarification and supplementation of its opinion before relying on its fact finding, since I believe that the opinion is ambiguous and insufficient in material respects.

For example, Appellant presents a colorable argument that the PCRA court's finding of a reasonable strategy on trial

counsel's part in foregoing objections to the improper references to post-arrest silence makes sense only in light of the court's interrelated understanding that counsel had otherwise preserved an objection relative to such references, *see Commonwealth v. Duffey*, No. 84 CR 176, at 5–6 (C.P. Lackawanna Dec. 15, 2004) (indicating that the issues regarding Dr. Hume's testimony were preserved). Appellant notes that the court elaborated on this view at the supplemental hearing on remand, as follows:

> [M]y theory behind my reasoning and rationale in support of my decision here today is that [trial counsel] in my view, first of all, did properly preserve the appeal. He preserved it in both his pretrial filings and his trial objections particularly in light of the relaxed waiver rule that was in place in 1984 with regard to death penalty cases in constitutional issues.

> I further found that there was reasonable basis and rationale for not objecting once again during the course of the testimony because, one, it was already preserved. But more importantly [counsel] didn't want to call attention ...

N.T., November 18, 2004, at 166–67.[1] On the other hand, however, the PCRA court otherwise expressly credited, at least in theory, the Commonwealth's argument that appellate counsel could not have been ineffective for failing to preserve this issue, because the underlying claim of trial-counsel inef-

1. The majority indicates that this statement on the part of the PCRA court relates to preservation of an objection to Dr. Hume's testimony generally, not to the specific constitutional error that this Court discussed in *Duffey II. See* Majority Opinion, 585 Pa. at 506 n. 4, 889 A.2d at 63 n. 4. This position, however, fails to take into account that this specific constitutional error was all that was before the PCRA court at the remand hearing. *See Duffey*, 579 Pa. 186, 205, 855 A.2d 764, 776 (2004)(remanding for an evidentiary hearing solely with respect to the issue of the stewardship of counsel relative to the prejudicial testimony concerning post-arrest silence). It therefore appears reasonably clear to me that the PCRA court was expressing the position that the general objections obviated the specific, relevant ones. Indeed, it seems unlikely that the PCRA court would couch its "reasoning and rationale in support of [its] decision here today" in terms of counsel's preservation of issues and errors that were not before the court.

fectiveness was unmeritorious. *See Duffey*, No. 84 CR 176, *slip op.* at 7.[2]

To the degree that the PCRA court misapprehended that a general objection to expert testimony will preserve a challenge to an inappropriate reference to post-arrest silence occurring in the witness's examination, I believe that such potential misunderstanding colors the court's findings and conclusions, and therefore, they should not be relied upon in our review as if detached from their ambiguous context.

If the PCRA court's opinion is, as the majority holds, that counsel's conduct in failing to preserve an objection to the prejudicial references to post-arrest silence was reasonable, I have substantial reservations about accepting it, because the opinion lacks a meaningful, supporting evaluation.

For example, while crediting trial counsel's testimony that he forewent objections to the prejudicial testimony and argument because he had made other objections and did not wish to appear obstreperous to the jurors, the PCRA court has offered no review of any portion of the trial record concerning such other objections in terms of their quality and likelihood of success relative to the objections that could have been made to alleviate the prejudice ensuing from the references to post-arrest silence. It seems to me that, before accepting counsel's logic that his making of unmeritorious objections foreclosed ones necessary to prevent prejudice that is reasonably likely to have affected the imposition of a sentence of death, *see Duffey*, 579 Pa. at 204, 855 A.2d at 775 (finding that Appellant was prejudiced by the commentary concerning his post-arrest silence), a reviewing court would be duty bound to make some evaluation along these lines to distinguish between truly reasonable strategic choice and serious miscalculation. Indeed, the mere fact that the other objections asserted afford no cause for relief, as did the omitted one, seems to me to suggest a degree of circumspection in evaluating such ques-

---

**2.** The PCRA court reasoned that it nevertheless was required to address appellate counsel's conduct in a more abstract fashion in light of this Court's remand order. *See Duffey*, No. 84 CR 176, *slip op.* at 8.

tionable stewardship that is not reflected in the PCRA court's opinion.

Concerning the alternate explanation that counsel held some notion (that he later abandoned) that he might be able to turn the references to Appellant's post-arrest silence to Appellant's advantage by using them to demonstrate his limited mental capacity, *see* Majority Opinion, 585 Pa. at 503–04, 889 A.2d at 62, it seems apparent to me that there were ample, alternate means available to counsel to make his point (including the direct testimony of his own experts) that were substantially more direct and consistent with the objective of advancing his client's interests in avoiding the imposition of a death sentence than permitting prejudicial testimony impinging on Appellant's constitutional right against self-incrimination onto the record concerning Appellant's refusal to answer questions posed by the Commonwealth's expert witness.[3] In this regard, counsel's reasoning on its face appears to fall squarely within the category of serious miscalculation, as opposed to reasonable strategy.

---

**3.** It merits emphasis here that the expert had advised Appellant that such refusal would be without penalty to him. *See Duffey,* 579 Pa. at 199–200, 855 A.2d at 772.