COMMONWEALTH of Pennsylvania,
Appellant

v.

Desmond Markel HAMMOND,
Appellee.

Superior Court of Pennsylvania.

Submitted March 10, 2008.
Filed June 11, 2008.
Reargument Denied Aug. 19, 2008.

Andrew J. Serina, Asst. Dist. Atty., for Com., appellant.

Joseph P. Nahas, Jr., Frackville, for appellee.

BEFORE: STEVENS, PANELLA, and HUDOCK, JJ.

OPINION BY STEVENS, J.:

¶ 1 The Commonwealth appeals from the order entered in the Court of Common Pleas of Schuylkill County, which granted Appellee's petition filed under the Post Conviction Relief Act (PCRA), 42 Pa. C.S.A. §§ 9541–9546 vacated Appellee's judgment of sentence, and directed a new trial due to the ineffective assistance of trial counsel, coupled with after-discovered evidence.[1] The Commonwealth contends the PCRA court erred in granting Appellee a new trial on the basis (1) trial counsel was ineffective in failing to call as a witness and investigate properly Achille Walker and (2) after-discovered evidence in the form of Kelvin Robertson's recanted testimony. We reverse the order granting a new trial and reinstate Appellee's judgment of sentence.

¶ 2 Relevant facts and procedural history are as follows: Following an altercation at a night club, Appellee fatally shot the victim, Clinton Hallick, in the parking lot of an apartment complex during the early morning hours of March 12, 2004. Represented by Jay Nigrini, Esquire, Appellee proceeded to a six-day jury trial, at which Appellee asserted a claim of self-defense and numerous witnesses testified on behalf of the Commonwealth and Appellee. Specifically, Leeann Santiago testified that there was a fight at a night club between Appellee and the victim, both of whom Ms. Santiago knew well. After the fight, Ms. Santiago and her friends went back to Ms. Santiago's apartment, and Appellee appeared at her door holding a gun at his side. N.T. 3/17/05 at 154–157. Ms. Santiago asked for the gun but Appellee would

---

1. This appeal is properly before us under Pa. R.A.P. 311(a)(6), which permits an interlocutory appeal as of right where a new trial is awarded and the Commonwealth claims the lower court committed an error of law.

not relinquish it. N.T. 3/17/05 at 157–158. Ms. Santiago, her friends, and Appellee, who was still holding a gun, left the apartment and began walking across the parking lot with the intent of retrieving the children of one of Ms. Santiago's friends. N.T. 3/17/05 at 159–160. At this point, two vehicles pulled into the parking lot, and the victim and his friends exited the vehicles. N.T. 3/17/05 at 162–163. The victim and a girl approached Ms. Santiago, her friends, and Appellee, and Ms. Santiago told the victim to leave. N.T. 3/17/05 at 166. The victim pushed Ms. Santiago. N.T. 3/17/05 at 167. Ms. Santiago did not see the victim in possession of a gun, although she saw the victim put his hand under his shirt. N.T. 3/17/05 at 167, 199. Ms. Santiago then noticed her sister fighting with a girl, and while her attention was distracted, Ms. Santiago heard three gunshots. N.T. 3/17/05 at 168–169. The victim ran and Appellee drove away in his vehicle. N.T. 3/17/05 at 169. Ms. Santiago indicated she did not see the victim with a gun at the night club, prior to the parking lot shooting. N.T. 3/17/05 at 187. In fact, Ms. Santiago testified she only saw one person with a gun and that was Appellee. N.T. 3/17/05 at 169.

¶ 3 Hospedales, who was the victim's paramour, testified she never saw the victim with a gun. N.T. 3/18/05 at 243–245. Ms. Hospedales admitted that the victim was involved in an altercation with Appellee at a night club, and after the bouncers threw the men outside, Ms. Hospedales left with the victim in a vehicle. N.T. 3/18/05 at 252–253. Ms. Hospedales did not observe any guns while riding in the vehicle. N.T. 3/18/05 at 254, 260. At some point, "Smack"[2] called the victim and told the victim to go to the apartment complex because "Smack" was concerned for his children's safety because Appellee had a

gun. N.T. 3/18/05 at 256. Ms. Hospedales drove to the apartment complex, where "Smack's" children resided, and Ms. Hospedales saw Appellee standing with some girls in the parking lot. N.T. 3/18/05 at 260–263. Ms. Hospedales and the victim exited the vehicle; Ms. Hospedales did not see the victim carrying a gun. N.T. 3/18/05 at 310. Ms. Hospedales approached the girls, who were with Appellee, and engaged in a physical altercation; Ms. Hospedales admitted that she was carrying a knife. N.T. 3/18/05 at 270, 280. While she was fighting, she heard the victim yell, "[G]ive me a fair one." N.T. 3/18/05 at 271. Ms. Hospedales then heard gunshots and saw the victim running. N.T. 3/18/05 at 272–273. She saw Appellee jump into a vehicle, and a girl ran over to the vehicle and screamed at Appellee, "[W]hy did you have to shoot. We all have kids, and [Appellee] rambled on [about] something, he called her a bitch and left." N.T. 3/18/05 at 273–274. Ms. Hospedales ran to the victim, who was lying on the ground, and the victim said, "The pussy shot me." N.T. 3/18/05 at 275. Ms. Hospedales began searching for the bullet holes; she did not find a gun on the victim and no one removed a gun from the victim. N.T. 3/18/05 at 276, 318. Ms. Hospedales admitted that she threw her knife in the drain but no one disposed of a gun. N.T. 3/18/05 at 281.

¶ 4 Crabbe testified she never saw the victim in possession of a firearm while riding in the vehicle with him and Ms. Hospedales. N.T. 3/18/05 at 344. Ms. Crabbe indicated that, at the apartment complex parking lot, the victim exited the vehicle and approached Appellee and the girls. N.T. 3/18/05 at 353–354. She heard the Santiago girls yell, "[D]on't, don't, don't, Clint, don't. He got a gun." N.T.

---

**2.** As will be discussed *infra*, "Smack" is a    nickname for Kelvin Robertson.

3/18/05 at 354. She then saw that Appellee was carrying a gun. N.T. 3/18/05 at 355. As an altercation between the girls ensued, Appellee pointed the gun at her and told her to "stay down;" she ducked behind a vehicle, which she later discovered was Appellee's vehicle. N.T. 3/18/05 at 355–356. Appellee pointed the gun at her and the victim, and the victim yelled, "[P]ut the gun down. Be a man. We could fight this out." N.T. 3/18/05 at 356. Every time Ms. Crabbe "popped her head up" to look, Appellee pointed the gun at her and told her to "stay down." N.T. 3/18/05 at 356–357. Ms. Crabbe testified she believed Appellee had targeted her, as well as the victim, because she was "dressed more like a male figure." N.T. 3/18/05 at 359. Appellee then fired a shot at the victim, and Ms. Crabbe lay flat behind the vehicle. N.T. 3/18/05 at 360–361. She heard the victim say, "Drop the gun." N.T. 3/18/05 at 379. She quickly heard several more shots and saw the victim running. N.T. 3/18/05 at 361. Appellee then entered his vehicle, and Ms. Crabbe was afraid Appellee would open the passenger-side door and shoot her; however, he just drove away. N.T. 3/18/05 at 362. Ms. Crabbe ran to the victim; she did not see the victim in possession of a gun and no one removed a gun from the victim's possession. N.T. 3/18/05 at 364–365. Ms. Crabbe indicated the victim did not have a gun with him that night and no one hid a gun in the vehicle. N.T. 3/18/05 at 377–378.

¶ 5 Jenni Santiago testified that Appellee appeared at Leeann Santiago's apartment holding a gun, and Leeann told him to go home. N.T. 3/18/05 at 398. While they were talking, a vehicle pulled into the parking lot, and a group of people, including the victim, exited the vehicle. N.T. 3/18/05 at 403. The victim approached the general vicinity of Appellee, and Jenni Santiago told the victim to "just go home,

Clint, you don't know what he has[.]" N.T. 3/18/05 at 413. Jenni Santiago saw the victim raise his hands and say, "Let's box it out." N.T. 3/18/05 at 404–405. Jenni Santiago understood this to mean that the victim wanted to fist fight with Appellee; she did not see the victim with a gun. N.T. 3/18/05 at 404–405. Appellee stared at the victim, and Ms. Hospedales started physically fighting with Jenni Santiago. N.T. 3/18/05 at 407. Jenni Santiago heard three quick gunshots and saw the victim running with an obvious injury. N.T. 3/18/05 at 411.

¶ 6 Athena Sacco testified "Smack" is her paramour, and she never saw the victim in possession of a gun. N.T. 3/18/05 at 430–432. Ms. Sacco testified that "Smack" and Appellee did not like each other, and after the night club altercation, "Smack" called the victim and told him they were going to the apartment complex to get the children. N.T. 3/18/05 at 444. Ms. Sacco feared that Appellee might come to the apartment complex, where one of the Santiago sisters also lived. N.T. 3/18/05 at 446–447. At some point, she heard three gunshots; however, she, "Smack," and the children stayed in their apartment. N.T. 3/18/05 at 447.

¶ 7 Kelvin Robertson testified his nickname is "Smack," and he is in jail for possession of narcotics with the intent to deliver. N.T. 3/21/05 at 465–466. He never knew the victim to carry a gun. N.T. 3/21/05 at 468. Mr. Robertson was at the night club and observed Appellee dancing and throwing hand signals towards the victim. N.T. 3/21/05 at 475–476. As Appellee pointed his finger at the victim, Appellee said, "That's for your man." N.T. 3/21/05 at 476. In response, the victim punched Appellee and an altercation between numerous people occurred. N.T. 3/21/05 at 475–477. At some point, he saw a girl holding a gun, and one of Appellee's

friends smacked it out of her hands. N.T. 3/21/05 at 479. Mr. Robertson did not see anyone retrieve the gun. N.T. 3/21/05 at 479. Mr. Robertson did not observe the victim with a gun during the night club fight, and he noted that the victim was wearing sweatpants and "you can't tuck nothing in the waistband of sweat pants." N.T. 3/21/05 at 480. After the fight, Mr. Robertson, who went to the hospital with a friend, called the victim and asked him to go to the apartment complex to check on his children because they were with a babysitter. N.T. 3/21/05 at 483–484, 498. The victim said he would call back Mr. Robertson, and when he did so, the victim indicated he was on his way to the apartment complex. N.T. 3/21/05 at 484. When Mr. Robertson returned to his children at the apartment, the victim had never arrived. N.T. 3/21/05 at 485. He later learned the victim had been shot. N.T. 3/21/05 at 488–489. Mr. Robertson then dressed as a woman and left the apartment because he was a parole violator; he was subsequently arrested in Philadelphia. N.T. 3/21/05 at 490–491. Mr. Robertson admitted that he uses aliases and false social security numbers, and he has sold drugs in the past. N.T. 3/21/05 at 492–493. Mr. Robertson did not tell the victim to bring a gun with him to the apartment complex, and he denied taking a gun from the victim's possession following the shooting. N.T. 3/21/05 at 499–504.

¶ 8 Jodie Lynn Bauscher testified she lived next door to "Smack" and Ms. Sacco, and she was at the night club during the time in question. N.T. 3/21/05 at 506–509. Following the altercation, she went to Leeann Santiago's apartment, and she saw Appellee pacing outside with a gun in his hand. N.T. 3/21/05 at 511. Leeann Santiago told Appellee to go home, and Leeann Santiago and Appellee then walked to the parking lot. N.T. 3/21/05 at 513–515. Ms. Bauscher could not see the parking lot, although she later heard gunshots. N.T. 3/21/05 at 516.

¶ 9 Justin Moyer testified he never knew the victim to possess a gun, and he did not see the victim in possession of a gun during the night club altercation. N.T. 3/21/05 at 540, 546–547. Mr. Moyer saw the victim and Appellee physically fight at the night club, and the bouncers threw the victim and Mr. Moyer outside. N.T. 3/21/05 at 547. After the fight, Mr. Moyer went back inside of the night club, and Appellee told Mr. Moyer that he was going to get him and the victim out on the street. N.T. 3/21/05 at 550. Mr. Moyer hit Appellee, and the bouncers threw Mr. Moyer outside. N.T. 3/21/05 at 551. Mr. Moyer went back to Leeann Santiago's apartment, and at some point, Leeann Santiago told Mr. Moyer that Appellee was outside with a gun. N.T. 3/21/05 at 553–554. Mr. Moyer stayed inside of the apartment but he left when someone came inside and told him that the victim, who was his childhood friend, was in the parking lot. N.T. 3/21/05 at 555. Mr. Moyer walked towards the parking lot and walked directly to the victim, who was standing next to Ms. Hospedales. N.T. 3/21/05 at 557. Ms. Hospedales yelled at Mr. Moyer, until the victim indicated that Mr. Moyer was "cool." N.T. 3/21/05 at 558. Ms. Hospedales then walked away, and Mr. Moyer conversed with the victim, who was not holding a gun and did not have a gun in his waistband. N.T. 3/21/05 at 558–560. Mr. Moyer told the victim he should leave, and Mr. Moyer then saw the girls fighting. N.T. 3/21/05 at 560. Mr. Moyer and the victim walked towards the parked vehicles and someone yelled that Appellee had a gun. N.T. 3/21/05 at 561–562. Mr. Moyer turned around and saw Appellee holding a gun and facing Mr. Moyer and the victim. N.T. 3/21/05 at 562. The victim put his hands up and said, "Let's fight like men."

N.T. 3/21/05 at 563. Mr. Moyer then heard the first gunshot, he felt pain in his leg, and the victim pushed Mr. Moyer to the ground. N.T. 3/21/05 at 564. After a short pause, two more shots were fired, although Mr. Moyer could not see from where the shots came since he was on the ground. N.T. 3/21/05 at 566. Mr. Moyer saw the victim running and "everything went fuzzy." N.T. 3/21/05 at 566. Mr. Moyer testified that whatever struck his leg, which caused a large black and blue mark and put a hole in his pack of cigarettes, came from Appellee's gun. N.T. 3/21/05 at 565–567. Mr. Moyer opined that he was struck by a bullet, which was deflected by his pack of cigarettes. N.T. 3/21/05 at 57–577.

¶ 10 Zachary Jacob Terry, who was in prison awaiting trial on drug charges, testified he never saw the victim in possession of a gun. N.T. 3/21/05 at 667. Mr. Terry was not present during the altercation at the night club; however, he was present with Ms. Hospedales and the victim when they drove to the apartment complex. N.T. 3/21/05 at 669–670. Mr. Terry did not see anyone, including the victim, with a gun while they were in the vehicle. N.T. 3/21/05 at 670. However, he heard Ms. Hospedales and the victim arguing over whether it was appropriate to use a weapon. N.T. 3/21/05 at 686. Specifically, Ms. Hospedales indicated there was no need for a weapon and the victim told her to "be quiet." N.T. 3/21/05 at 686. There was no discussion as to the type of weapon over which the couple was arguing; however, the victim was angry. N.T. 3/21/05 at 686. When they arrived in the parking lot, the Santiago sisters and Appellee were in the parking lot. N.T. 3/21/05 at 671. Ms. Hospedales began fighting with the girls, and Mr. Terry saw Mr. Moyer approach. N.T. 3/21/05 at 674. Mr. Terry saw Appellee with a gun, and he told the police he heard the victim say "I want a fair one."

N.T. 3/21/05 at 674–677. Mr. Terry did not see the victim with a gun. N.T. 3/21/05 at 677. Mr. Terry heard a gunshot and saw a spark come from Appellee's gun. N.T. 3/21/05 at 678. Mr. Terry ran and he heard three more gunshots. N.T. 3/21/05 at 678–680. When Mr. Terry turned around, the victim was running behind him. N.T. 3/21/05 at 678–679. They ran behind a building, and the victim lay down, indicating he had been hit. N.T. 3/21/05 at 679–681. Mr. Terry did not remove anything from the victim and he did not observe anything lying near the victim. N.T. 3/21/05 at 681–682.

¶ 11 Steve William Kane testified he lived in the apartment complex, he knew the victim, and he never saw the victim in possession of a gun. N.T. 3/21/05 at 694–695. Mr. Kane confirmed there was a fight at the night club, and after the fight, he went to Leeann Santiago's apartment. N.T. 3/21/05 at 700–701. At some point, Mr. Kane went outside and saw Appellee holding a gun. N.T. 3/21/05 at 704. Appellee asked Leeann if she knew where "Smack" was and Leeann Santiago said, "Don't do it, it's not worth it." N.T. 3/21/05 at 705–706. Mr. Kane went back inside of the apartment and heard Leeann Santiago say the victim had arrived. N.T. 3/21/05 at 707. Mr. Kane told Mr. Moyer about the victim's arrival, and Mr. Moyer ran to the parking lot, with Mr. Kane following behind him. N.T. 3/21/05 at 707. Mr. Kane saw the victim standing near Mr. Moyer, with Appellee standing nearby. N.T. 3/21/05 at 710. Mr. Kane heard the victim say, "Put the weapon down, let's fight like a man, let's fight like men." N.T. 3/21/05 at 711. Mr. Kane saw Appellee pointing a gun in the direction of the victim and Mr. Moyer, he heard a gunshot, and he saw sparks coming from the gun. N.T. 3/21/05 at 711–712. Mr. Kane saw the victim pushing Mr. Moyer to the

ground, and he heard Mr. Moyer say he had been shot. N.T. 3/21/05 at 713. Mr. Kane turned his back so that, although he heard a second gunshot, he did not see from where it came. N.T. 3/21/05 at 714–715. However, Mr. Kane heard a third, fourth, and fifth gunshot, and he saw the shots coming from Appellee's gun. N.T. 3/21/05 at 715. Mr. Kane ran with Mr. Moyer to Leeann's apartment, and then Mr. Kane went looking for the victim. N.T. 3/21/05 at 715. Mr. Kane never observed a gun in the victim's pants or on the ground. N.T. 3//21/05 at 717. Mr. Kane never saw the victim in possession of a gun during the incident in question, he did not see anyone remove an object from the victim, and he did not see anyone remove an object from the parking lot area. N.T. 3/21/05 at 718.

¶ 12 Dr. Sara Lee Funke, a forensic pathologist, testified she performed an autopsy on the victim at 8:00 a.m. on March 13, 2004. N.T. 3/21/05 at 620. Dr. Funke indicated that the victim suffered three gunshot wounds to his torso and one gunshot wound to his hand. N.T. 3/21/05 at 625–635. Dr. Funke explained, through the use of a mannequin, that the victim was twisting and turning away from Appellee during the shooting, and he was not holding a gun in his right hand when at least some of the bullets entered his body. N.T. 3/21/05 at 645–656. Dr. Funke opined, to a reasonable degree of medical certainty, that at the time he was shot, the victim's left side of his body was facing the shooter and the victim was not directly facing the shooter. N.T. 3/21/05 at 658. Dr. Funke opined that the victim could have been turning to his right and pushing someone down when he was shot. N.T. 3/21/05 at 663–664.

¶ 13 Pennsylvania State Trooper Andrea Young testified that the only gun turned over to the police was by Appellee and his attorney. N.T. 3/17/05 at 76. No gun was recovered from the scene or the victim's body. N.T. 3/17/05 at 73. Trooper Young testified Appellee told her that he believed the victim was carrying a gun in his waistband during the parking lot incident; however, Trooper Young indicated that the victim was wearing sweatpants when he was shot and it would be difficult to carry a handgun in the waistband of sweatpants. N.T. 3/17/05 at 108–109. Corporal Michael Carney confirmed no guns were recovered from the scene. N.T. 3/18/05 at 225–226.

¶ 14 Trooper Brian Walters testified that some witnesses mentioned observing a gun during the altercation at the night club and, shortly after the altercation ended, Trooper Walters received a gun from one of the night club bouncers. N.T. 3/22/05 at 738–740. Trooper Kevin Mills testified that the gun, which was recovered from the night club bouncer, was registered to a deceased man, "Jackie Hodges," who had an address of Philadelphia. N.T. 3/22/05 at 770–771.

¶ 15 At this point, the Commonwealth rested its case and the defense witnesses began to testify. Specifically, Raymond Bruen testified he was a patron at the night club at the time of the altercation and, as he was attempting to leave, a gun went sliding across the floor. N.T. 3/22/05 at 773. A Caucasian male, who had a military-style haircut and was wearing a flannel-type jacket, approached a bouncer and said "I want to make this right. Give me … where's the gun? Give the gun back."[3] N.T. 3/22/05 at 775. The bouncer, who had seized the gun, did not give

---

**3.** This matches the description of one of the men who accompanied Appellee at the night club. N.T. 3/21/05 at 477.

the gun back to the male; but rather, he turned it over to the police. N.T. 3/22/05 at 777–778.

¶ 16 Ken Payne testified that he was a bartender at the night club on the evening of the altercation and one of the bouncers picked up a gun. N.T. 3/22/05 at 782–783. The bouncer handed the gun to Mr. Payne's wife, who in turn handed it to Mr. Payne, who then "popped the clip out of it" and put the gun in the backroom in a filing cabinet. N.T. 3/22/05 at 783. Mr. Payne indicated he saw no other gun at the night club that evening. N.T. 3/22/05 at 785.

¶ 17 Joan Payne testified that she is married to Ken Payne's son, and she was a bartender at the night club on the evening of the altercation. N.T. 3/22/05 at 788. She testified that the victim is a regular and usually has a lot of money. N.T. 3/22/05 at 790. When the fight broke out, Ms. Payne observed one of the bouncers handing her mother-in-law, Diane Payne, a gun, which Diane Payne took into the backroom. N.T. 3/22/05 at 791. Ms. Payne admitted that she did not see the victim with a gun at the night club on the night in question. N.T. 3/22/05 at 795.

¶ 18 Amy Bailey testified that she lived in an apartment near Ms. Sacco, and during the early morning hours of March 12, 2004, she heard gunshots. N.T. 3/22/05 at 798. Two or three minutes later, she saw a large African–American male knocking on the door of Ms. Sacco's apartment indicating to let him in, and a few seconds later, she saw Ms. Sacco walking down the sidewalk and entering her apartment. N.T. 3/22/05 at 798. Approximately ten minutes later, the police appeared at Ms. Sacco's apartment door. N.T. 3/22/05 at 799. Ms. Bailey believes that the man who was knocking on Ms. Sacco's door was "Smack." N.T. 3/22/05 at 802.

¶ 19 Travis Harris testified that he went to the night club with Appellee, and during the evening, a group of males began calling Appellee names. N.T. 3/22/05 at 811. The victim suddenly punched Appellee and, while tussling with Appellee, the victim reached under his shirt for some unidentified object. N.T. 3/22/05 at 812–813. Mr. Harris began punching the victim until someone struck Mr. Harris in the head with a beer bottle. N.T. 3/22/05 at 814. Mr. Harris went into the kitchen, where Appellee joined him. N.T. 3/22/05 at 816. Appellee, Mr. Harris, and a man called "Junior" went to the hospital because Mr. Harris was bleeding profusely. N.T. 3/22/05 at 817. During the ride to the hospital, Appellee was talking on his cell phone to a female. N.T. 3/22/05 at 818. Appellee, who lost his glasses during the night club fight, was telling the female that he was having difficulty seeing while he was driving to the hospital. N.T. 3/22/05 at 819. Mr. Harris and "Junior" remained at the hospital but Appellee left. N.T. 3/22/05 at 820. A short time later, Mr. Harris called Appellee, who indicated that he was coming back to the hospital; however, Appellee did not return, so Mr. Harris again telephoned Appellee. N.T. 3/22/05 at 820–821. While talking to Appellee, Mr. Harris heard a female voice saying, "Let's go in the house," and Appellee said, "No, he's not going in." N.T. 3/22/05 at 844. He also heard Appellee say, "Don't do this. Chill out, stop, let's not do this," and Mr. Harris heard gunshots. N.T. 3/22/05 at 821–822. Feeling paranoid, Mr. Harris hung up the phone; however, Appellee called back and told "Junior" that he was coming to the hospital. N.T. 3/22/05 at 822. Thereafter, a woman came into the hospital and directed Mr. Harris and "Junior" to a nearby minimart, where Appellee was waiting in a vehicle. N.T. 3/22/05 at 823. When questioned, Appellee told Mr. Harris he had to use his gun. N.T. 3/22/05 at 824. Mr.

Harris was not aware that Appellee had been carrying a gun and he had never seen Appellee in possession of a gun prior to that evening. N.T. 3/22/05 at 827, 829. Appellee then drove Mr. Harris to West Reading Hospital, where Mr. Harris finally received treatment for his head wound. N.T. 3/22/05 at 825. Mr. Harris and Appellee left the hospital separately. N.T. 3/22/05 at 826.

¶ 20 Norman Schwartz testified he was a bouncer at the night club and he saw a fight. N.T. 3/22/05 at 852. After the fight, the victim was outside yelling, although at the time of trial Mr. Schwartz could not remember exactly what the victim was yelling. N.T. 3/22/05 at 855. Mr. Schwartz saw a black female outside waving a gun; however, Mr. Schwartz was unable to identify the black female, who was one of approximately ten or twenty black females at the night club on the night in question. N.T. 3/22/05 at 856–859. Mr. Schwartz never saw the victim in possession of a gun on the night in question. N.T. 3/22/05 at 860.

¶ 21 Kevin Harris testified that he accompanied "Smack" to the night club, and the victim started the fight when he punched Appellee. N.T. 3/22/05 at 866. During the altercation, Mr. Harris hit Appellee's friend with a beer bottle, thereby cutting his finger. N.T. 3/22/05 at 864. Mr. Harris observed neither the victim nor Appellee with a gun while they were in the night club; however, Mr. Harris was carrying a gun. N.T. 3/22/05 at 867. Mr. Harris testified that, in the past, he had seen the victim and "Smack" in possession of firearms on more than one occasion; however, it had been a while since he had seen the victim with a gun. N.T. 3/22/05 at 868–869. Mr. Harris spent the rest of the evening in the hospital due to his lacerated finger; he left his gun in a jacket in the car and it was never in the victim's

possession. N.T. 3/22/05 at 870, 875. The victim never went to the hospital with Mr. Harris, although "Smack" appeared for a short time to check on Mr. Harris' injuries. N.T. 3/22/05 at 875–876. When Mr. Harris left the hospital at close to daybreak, his gun was where he had left it in his jacket in the car. N.T. 3/22/05 at 877. Mr. Harris then went home; he did not go to the apartment complex where the shooting occurred. N.T. 3/22/05 at 880. Mr. Harris reiterated that, on the night in question, the victim was not carrying a gun, although Mr. Harris had observed him carrying a gun in the past. N.T. 3/22/05 at 873–874, 879.

¶ 22 Liza Santiago testified that she was babysitting at the apartment complex and did not go to the night club. N.T. 3/22/05 at 883. At some point, her sister, Jenni Santiago, telephoned to report that there had been a fight at the night club. N.T. 3/22/05 at 884. Liza Santiago telephoned the victim and, while talking with him, Ms. Hospedales apparently grabbed the victim's telephone and stated to Liza Santiago that she was coming to the house, she better get the children out, and she was going to blow it up. N.T. 3/22/05 at 885. Liza Santiago then talked to Appellee, who asked if Liza could drive him and a friend to the hospital, and Liza answered affirmatively. N.T. 3/22/05 at 887. Appellee appeared a short time later and asked to be taken to Reading. N.T. 3/22/05 at 888. Appellee was not holding a gun. N.T. 3/22/05 at 891–892. Liza Santiago and Appellee went to the parking lot and two vehicles entered and parked. N.T. 3/22/05 at 892. The victim and Ms. Hospedales exited one of the vehicles and approached Appellee and the Santiago sisters. N.T. 3/22/05 at 893. Everyone started yelling, Liza Santiago heard Appellee say, "I want a fair one, just give me a fair one," and Ms. Hospedales began hitting Jenni Santiago. N.T. 3/22/05 at 895. Liza Santiago

started physically fighting with Ms. Hospedales and someone yelled, "She's got a knife, Leeann, get your face away." N.T. 3/22/05 at 896. Liza continued fighting, heard three gunshots, and sustained a nick to the corner of her eye from the knife. N.T. 3/22/05 at 897–898. The girls' fight ended, and Liza saw Appellee leaving in his vehicle. N.T. 3/22/05 at 898. Liza did not observe the victim or Appellee in possession of a gun that night, although she had seen the victim in possession of a gun on previous occasions. N.T. 3/22/05 at 904–905, 925. Liza never saw Appellee carrying a gun. N.T. 3/22/05 at 911. During police questioning, Liza saw Mr. Moyer crying and stating that he was going to be charged for selling drugs with "Smack" and the victim. N.T. 3/22/05 at 904. Liza indicated that the victim was in a rage while he was in the parking lot and she had seen him act that way previously during a fight at the night club and when he fought with an intruder, who had broken into Liza's apartment. N.T. 3/22/05 at 905–906.

¶ 23 Jason Macunas testified that he was the victim's probation supervisor, and the victim was on probation following convictions for endangering the welfare of children and possession of a small amount of marijuana. N.T. 3/22/05 at 932. As a term of his probation, the victim was not permitted to carry a gun, and the victim never told Mr. Macunas that he owned a gun. N.T. 3/22/05 at 932, 937. The victim never violated any of the terms of his probation; however, Mr. Macunas indicated that a random drug test in December of 2003 revealed the victim had used marijuana. N.T. 3/22/05 at 938, 941.

¶ 24 Trooper Kevin O'Brien testified he interviewed Kelvin Robertson, who indicated that females named "Schmiki" and Ms. Crabbe had guns at the night club. N.T. 3/23/05 at 950–951. Trooper O'Brien was told by Mr. Kane that Mr. Moyer, the victim, and Mr. Robertson, a/k/a "Smack", were dealing drugs. N.T. 3/23/05 at 952.

¶ 25 Appellee, who worked for a community correctional facility under the direction of the Department of Corrections, testified that, prior to March 12, 2004, he had a license to carry a firearm. N.T. 3/23/05 at 958. Appellee went to the night club with some friends on the night in question, and he had a loaded handgun, which he kept in his vehicle under the front seat. N.T. 3/23/05 at 960–962. While Appellee was dancing, the victim and some of his friends lined up beside Appellee. N.T. 3/23/05 at 966. The victim and his friends started throwing hand signals to each other, and Appellee walked away. N.T. 3/23/05 at 967–968. The victim and his friends followed Appellee, and the victim said, "Look at this bitch ass mother fucker." N.T. 3/23/05 at 969. Travis Harris approached the area, Appellee reported what the victim had said, and suddenly someone punched Appellee. N.T. 3/23/05 at 969–970. Appellee then saw the victim, who continued punching Appellee. N.T. 3/23/05 at 972. During the scuffle, Appellee saw that the victim was carrying a gun in the waistband of his pants, and as Appellee swatted at the gun, for which the victim appeared to be reaching, the gun slid across the night club's floor. N.T. 3/23/05 at 972–973. Bouncers broke up the fight, and while Appellee was outside in the parking lot, the victim and "Smack" ran towards Appellee and shouted, "Bitch. Bitch ass mother fucker. Come get your ass whooped. You just got your ass whooped by a white boy. Come get your ass whooped. Get in the street. I'll fucking kill you." N.T. 3/23/05 at 975. As Appellee attempted to follow the bouncers back into the night club, the victim grabbed at Appellee's shirt and Mr. Moyer punched Appellee in the face. N.T. 3/23/05 at 976–977. Appellee did not ob-

serve anyone with a gun at this time. N.T. 3/23/05 at 977. The bouncers pushed Appellee into the night club, and away from the victim, and directed Appellee into the kitchen, where Travis Harris was receiving assistance for his wound. N.T. 3/23/05 at 978. Appellee decided to drive Travis Harris to a hospital, and as Appellee was trying to find the local hospital, Liza Santiago called him. N.T. 3/23/05 at 981. Appellee asked her if he could pick her up to help him find a hospital, and she answered affirmatively. N.T. 3/23/05 at 981. As Appellee was driving to Liza Santiago's apartment, he saw the hospital and dropped off Travis Harris. N.T. 3/23/05 at 982. Appellee called back Liza Santiago and made plans for Liza Santiago to drive Appellee to Reading. N.T. 3/23/05 at 983. Appellee arrived at Liza Santiago's apartment, and while waiting for Liza to dress, Appellee moved his car and decided to visit Leeann Santiago. N.T. 3/23/05 at 986. Appellee took his gun from underneath his car seat, put on his holster, and walked to Leeann Santiago's apartment, while he was talking to Travis Harris on the telephone. N.T. 3/23/05 at 986–987. Appellee indicated he took the gun with him because he knew "Smack" lived in the area and he was afraid. N.T. 3/23/05 at 1049. Upon arrival at Leeann's apartment, Leeann told Appellee that the victim was going to kill him if he caught him. N.T. 3/23/05 at 988. With Leeann holding onto his arm, Appellee and Leeann walked to the parking lot, and Jenni and Liza Santiago joined them. N.T. 3/23/05 at 989. A vehicle pulled into the parking lot and Ms. Hospedales, the victim, Zachary Terry, and Ms. Crabbe, who Appellee thought at the time was a male, exited the vehicle. N.T. 3/23/05 at 993. Ms. Hospedales immediately ran over and began fighting with Jenni Santiago. N.T. 3/23/05 at 993. While reaching under his shirt, the victim screamed, "Mother fucker, I'm gonna kick your fucking ass. I'm gonna fucking kill you, you bitch ass mother fucker." N.T. 3/23/05 at 993–994. Appellee thought he saw a gun handle underneath the victim's shirt and he noticed "Smack" and another male standing nearby. N.T. 3/23/05 at 995. As Leeann Santiago was telling the victim to go home, Travis Harris called Appellee, who told Mr. Harris that it was not a good time to talk because he was in the presence of a man, who was holding a gun. N.T. 3/23/05 at 995–996. Suddenly, the victim grabbed Leeann Santiago by her hair, and Appellee told him to "back up." N.T. 3/23/05 at 997. The victim released Leeann, said "fuck this," and grabbed for his gun, which was in his waistband. N.T. 3/23/05 at 997. Appellee withdrew his gun, which was still in the holster, and fired three times. N.T. 3/23/05 at 998. Appellee testified he shot at the victim in order to not be shot himself. N.T. 3/23/05 at 1000. After he fired his gun, and not knowing whether he had shot anyone, Appellee jumped into his vehicle and drove towards Pottsville. N.T. 3/23/05 at 1000–1001. Appellee called Travis Harris and said, "I just fired my gun. I don't know what the hell … I don't know what the hell happened. I can't believe that somebody would come after me over, over a female." N.T. 3/23/05 at 1001. Appellee then picked up Travis Harris at a mini-mart, and Travis Harris asked him if he shot anyone. N.T. 3/23/05 at 1002. Appellee indicated that he did not think that his bullets had struck anyone. N.T. 3/23/05 at 1002. Appellee drove to the Reading Hospital, where he received treatment for injuries he had received from the night club fight, and the next day, he learned that the victim had died. N.T. 3/23/05 at 1004–1007. Appellee then contacted defense counsel and turned himself into the police. N.T. 3/23/05 at 1008. Appellee testified that he did not go

to the apartment complex with the intent of killing anyone. N.T. 3/23/05 at 1010.

¶ 26 On cross-examination, Appellee admitted that, when he first saw the victim in the apartment complex parking lot, Appellee was standing at the rear of his own vehicle. N.T. 3/23/05 at 1057. Appellee admitted that the victim, who was standing in front of Appellee's vehicle, was not blocking Appellee's path to the driver's side door. N.T. 3/23/05 at 1057. Appellee further admitted that the victim did not completely remove his gun from his waistband before Appellee fired three shots. N.T. 3/23/05 at 1062. After Appellee fired his gun, the victim ran and Appellee drove away. N.T. 3/23/05 at 1064.

¶ 27 Diane Marie Neider DeLong, who is a teacher, Aimee Troyen, who is an investment banker, Lane Cox, who worked with Appellee, Marshall Kauffman, who owns a gym and upholstery business, Zack Smith, who is a sheriff and police officer, and Maxine Smith, who is Appellee's grandmother, testified to Appellee's peaceful and law-abiding nature. N.T. 3/23/05 at 1082–1103.

¶ 28 At the conclusion of the testimony, Appellee was convicted of third-degree murder and related charges,[4] sentenced to a prison term of nine years to twenty years, and his motion for post-sentence relief was denied. Appellee filed a direct appeal to this Court contending the prosecutor committed misconduct in his closing argument to the jury, the prosecutor committed misconduct when he questioned character witness Aimee Troyen, and the trial court erred in permitting the use of a mannequin to depict the location of the decedent's bullet wounds. We found no merit to Appellee's contentions and affirmed his judgment of sentence on August 16, 2006. *See Commonwealth v. Hammond,* 1660 MDA 2005, at 2–3, 909 A.2d 879 (Pa.Super. filed Aug. 16, 2006) (unpublished memorandum).

¶ 29 Appellee did not file a petition for allowance of appeal to the Pennsylvania Supreme Court; however, on January 19, 2007, Appellee, who was represented by new counsel, filed a timely counseled PCRA petition. Following an evidentiary hearing held on February 22, 2007, by order and opinion entered on June 28, 2007, the PCRA court granted Appellee PCRA relief, vacated his judgment of sentence, and granted him a new trial. Specifically, the PCRA court concluded relief was warranted on the combined basis that trial counsel was ineffective in failing to investigate and call Achille Walker to testify and Kelvin Robertson recanted his trial testimony. The PCRA court found Appellee's remaining claims to be meritless.[5] The Commonwealth filed a motion for reconsideration, and on July 24, 2007, the Commonwealth filed a notice of appeal. On July 25, 2007, the PCRA court denied the Commonwealth's motion for reconsideration.[6] All Pa.R.A.P.1925 requirements have been met.

---

**4.** Specifically, Appellee was convicted of third-degree murder, 18 Pa.C.S.A. § 2501(a), aggravated assault, 18 Pa.C.S.A. § 2702(a)(1), simple assault, 18 Pa.C.S.A. § 2701(a)(1–2), four counts of recklessly endangering another person, 18 Pa.C.S.A. § 2705, and possessing an instrument of crime, 18 Pa.C.S.A. § 907(a-b).

**5.** We conclude the PCRA court did not abuse its discretion in finding the remaining claims to be meritless. *See Commonwealth v. Reaves,*

592 Pa. 134, 923 A.2d 1119 (2007) (discussing abuse of discretion standard in reviewing PCRA court's rulings); PCRA Court Opinion filed 6/28/07 at 17–28 (discussing Appellee's remaining PCRA claims).

**6.** On September 5, 2007, Appellee filed in this Court a motion to quash alleging the Commonwealth's notice of appeal was premature since it was filed one day prior to the PCRA court denying the Commonwealth's motion

¶ 30 On appeal, the Commonwealth contends the PCRA court erred in concluding a new trial was warranted on the basis that, coupled with Kelvin Robertson's after-discovered recantation, trial counsel was ineffective in failing to investigate further and call Achille Walker to testify on behalf of Appellee at trial. We begin with an analysis of whether the PCRA court erred in concluding trial counsel was ineffective in failing to call Achille Walker to testify at trial.[7]

The scope and standard of review applicable [to] a PCRA appeal are settled:

As a general proposition, an appellate court reviews the PCRA court's findings to see if they are supported by the record and free from legal error. The court's scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party.

*Commonwealth v. Duffey*, 585 Pa. 493, 889 A.2d 56, 61 (2005) (citations omitted).

* * *

The level of deference to the hearing judge may vary depending upon whether the decision involved matters of credibility or matters of applying the governing law to the facts as so determined.

*Commonwealth v. Reaves*, 592 Pa. 134, 141–142, 923 A.2d 1119, 1124 (2007) (citations omitted).

To prevail on a claim that counsel was constitutionally ineffective, the [petitioner] must overcome the presumption of competence by showing that: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceedings would have been different. A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim.

* * *

To prevail on a claim of ineffectiveness for failure to call a witness, the [petitioner] must demonstrate that: (1) the witness existed; (2) the witness was available; (3) trial counsel was informed of the existence of the witness or should have known of the witness' existence; (4) the witness was prepared to cooperate and would have testified on [the petitioner's] behalf; and (5) the absence of the testimony prejudiced [the petitioner].

*Commonwealth v. Miller*, 868 A.2d 578, 581–582 (Pa.Super.2005) (quotation omitted).

¶ 31 During the PCRA hearing, Appellee's trial counsel, Jay Nigrini, Esquire, Private Investigator Hugh Drey, and Mr. Walker testified regarding the investigation of Mr. Walker and the absence of his testimony at Appellee's trial. Specifically,

---

for reconsideration. However, as noted, the PCRA court subsequently entered an order denying the Commonwealth's petition for reconsideration, and therefore, we decline to quash the appeal on this basis. *See Commonwealth v. Little*, 879 A.2d 293 (Pa.Super.2005). Moreover, we note that, on December 17, 2007, Appellee filed in this Court a motion to dismiss on the basis the Commonwealth filed

untimely reproduced records. We decline to dismiss on this basis.

7. We note that Appellee was permitted to raise his ineffective assistance of trial counsel claims for the first time in his PCRA petition. *See Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002).

Attorney Nigrini testified that, prior to trial, he met with Appellee approximately ten times, and he was aware of Mr. Walker's existence. N.T. 3/7/07 at 4, 6. Attorney Nigrini indicated he did not speak personally with Mr. Walker regarding the possibility of calling him as a witness; however, his private investigator, Hugh Drey, spoke with Mr. Walker. N.T. 3/7/07 at 7. Attorney Nigrini testified Mr. Drey was hired to investigate all possible witnesses, who would aid Appellee's claim of self-defense. N.T. 3/7/07 at 9–10. On cross-examination by the district attorney, Attorney Nigrini indicated that Mr. Walker's name was included in the State Police report as a potential witness, Mr. Drey interviewed Mr. Walker, and Mr. Drey reported back to Attorney Nigrini regarding the substance of Mr. Walker's proposed testimony. N.T. 3/7/07 at 24. Based on the conversation with Mr. Drey, Attorney Nigrini made a tactical decision not to call Mr. Walker as a witness. N.T. 3/7/07 at 24. Specifically, the following relevant exchange occurred during the district attorney's cross-examination of Attorney Nigrini as to why he decided not to call Mr. Walker as a witness:

> [Attorney Nigrini]: I don't believe, based upon what I had, he actually places a gun in the hands of [the victim]. There was some talk about being able to get a gun prior to this date from, I believe Smack, but I don't believe based upon his interview that he physically put a gun in his hands, and considering I think he was incarcerated at the time facing charges. You know, there certainly could be the express bias towards the District Attorney's Office. So I believe that was the tactical reason for not calling him.
>
> [District Attorney]: So you're aware Achille Walker had serious drug charges pending against him at the time?
>
> [Attorney Nigrini]: Yes.

> [District Attorney]: And it was your understanding that Mr. Walker had no firsthand knowledge of what actually took place on the night in question?
>
> [Attorney Nigrini]: That's correct.

N.T. 2/22/07 at 25.

¶ 32 Private Investigator Hugh Drey testified he was hired by Attorney Nigrini to investigate the shooting at issue and Attorney Nigrini generally directed with whom Mr. Drey should speak. N.T. 2/22/07 at 35–36. During the PCRA hearing, neither Appellee nor the Commonwealth questioned Mr. Drey regarding his investigation of Mr. Walker. N.T. 2/22/07–35–38. In fact, during his brief questioning, the only witness Appellee's PCRA counsel questioned Mr. Drey about was Norman Schwartz. N.T. 2/22/07 at 36–37.

¶ 33 Mr. Walker testified that he is currently incarcerated, he was friends with the victim, and the victim carried a gun "once in a blue moon." N.T. 2/22/07 at 81–82. Mr. Walker indicated that he was not present during the altercation at the night club on March 11, 2004; however, a few days prior to the altercation, Mr. Walker had a conversation with the victim about Appellee. N.T. 2/22/07 at 82. Specifically, the victim told Mr. Walker that he was angry with Appellee because Appellee was dating Leeann Santiago, and the next time the victim saw Appellee there's "going to be problems." N.T. 2/22/07 at 82–83. Mr. Walker testified that, after the altercation at the night club, the victim called Mr. Walker to report that the victim had "beat … the shit out of [Appellee]" at the night club. N.T. 2/22/07 at 84. The victim told Mr. Walker "I'm going to get him again." N.T. 2/22/07 at 84. Mr. Walker indicated that, at this point, he warned the victim that Appellee had a license to carry a gun, and the victim said, "I don't care. I got my own back." N.T. 2/22/07 at 84. Mr.

Walker understood this to mean that the bouncers of the night club had returned the victim's gun to him. N.T. 2/22/07 at 85. Mr. Walker testified that the victim, who was driving in his car, said he was going to see Appellee. N.T. 2/22/07 at 85. Mr. Walker indicated he told this information to Mr. Drey; however, he never told this information to Attorney Nigrini. N.T. 2/22/07 at 85-86. Mr. Walker stated that he was available to testify at Appellee's trial but he was never asked to testify. N.T. 2/22/07 at 86. On cross-examination, Mr. Walker admitted that he was incarcerated at the time of Appellee's trial, there were multiple drug charges pending against him, and he was facing numerous mandatory minimum sentences in prison. N.T. 2/22/07 at 88.

¶ 34 Based on the aforementioned, we find the PCRA court properly concluded Mr. Walker existed, Mr. Walker was available to testify at Appellee's trial, Attorney Nigrini was informed of Mr. Walker's existence, and Mr. Walker was prepared to cooperate and testify on behalf of Appellee. *See* PCRA Court's Opinion filed 6/28/07 at 32-33. However, we specifically disagree with the PCRA court's conclusion that Appellee met his burden of proving that Attorney Nigrini did not have a reasonable basis for failing to call Mr. Walker to testify at trial on behalf of Appellee and that the absence of Mr. Walker's testimony prejudiced Appellee to the extent the outcome of the proceedings would have been different.

Failure to call a witness is not *per se* ineffective assistance of counsel, for such a decision implicates matters of trial strategy. It is [the petitioner's] burden to demonstrate that trial counsel had no reasonable basis for declining to call [a particular person] as a witness.

* * *

"Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." A claim of ineffectiveness generally cannot succeed through comparing, in hindsight, the trial strategy employed with alternatives not pursued.

*Commonwealth v. Washington,* 592 Pa. 698, 721-722, 927 A.2d 586, 599-600 (2007) (citations and quotation omitted).

¶ 35 In the case *sub judice,* Attorney Nigrini testified, without contradiction, that he made a tactical decision not to call Mr. Walker as a witness because Mr. Walker was incarcerated and awaiting trial on multiple drug charges. Mr. Walker confirmed that he was incarcerated at the time of Appellee's trial, with multiple drug charges pending against him. Attorney Nigrini concluded that such information would negatively affect Mr. Walker's credibility. Moreover, Attorney Nigrini testified that he concluded Mr. Walker's testimony would not be particularly beneficial to Appellee since Mr. Walker could, at most, establish that Appellee told him, prior to the incident, that he possessed a gun.[8] Attorney Nigrini concluded that,

---

**8.** We note that conspicuously absent from the PCRA hearing is any indication that Appellee's counsel questioned either Attorney Nigrini or Mr. Drey regarding the substance of the information provided to them by Mr. Walker prior to Appellee's trial. While Mr. Walker testified at the PCRA hearing that he told the investigator, Mr. Drey, about the telephone call he had with the victim, there is no testimony establishing what either the investigator or Attorney Nigrini's understanding was of this information. The only testimony establishing Appellee's counsel's understanding as to what information Mr. Walker could provide was established in general terms during

since Mr. Walker was not present during the shooting and did not see a gun, Mr. Walker could not actually place a gun in the victim's hands at the time of the incident or testify at all regarding the encounter. Mr. Walker confirmed during the PCRA hearing that he was neither present during the shooting nor observed the victim prior thereto. *See Commonwealth v. Chmiel,* 585 Pa. 547, 889 A.2d 501 (2005) (holding trial counsel cannot be ineffective for failing to call a witness in the absence of the witness's testimony being beneficial or helpful to the asserted defense).

¶ 36 Regarding prejudice, "it must be demonstrated that 'but for the act or omission in question, the outcome of the proceedings would have been different.'" *Commonwealth v. Rios,* 591 Pa. 583, 599–600, 920 A.2d 790, 799–800 (2007) (quotation omitted). "In the context of a PCRA proceeding, [the petitioner] must establish that the ineffective assistance of counsel was of the type 'which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt o[r] innocence could have taken place.'" *Commonwealth v. Washington,* 592 Pa. 698, 712, 927 A.2d 586, 594 (2007) (quotation omitted). Regarding self-defense, "[t]he use of force against a person is justified when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person." *Commonwealth v. Emler,* 903 A.2d 1273, 1279 (Pa.Super.2006) (citation omitted). When an accused raises a self-defense claim, the Commonwealth must prove beyond a reasonable doubt that the defendant's acts were not justifiable self-defense. *See id.*

The Commonwealth sustains this burden if it establishes at least one of the following: 1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused had a duty to retreat and the retreat was possible with complete safety. It remains the province of the jury to determine whether the accused's belief was reasonable, whether he was free of provocation, and whether he had no duty to retreat.

*Commonwealth v. McClendon,* 874 A.2d 1223, 1230 (Pa.Super.2005) (quotation, quotation marks, and citations omitted).

¶ 37 Here, assuming, *arguendo,* that Mr. Walker's account of the victim's telephone call would have been admissible under an exception to the hearsay rule,[9] we conclude the telephone call merely established that the victim may have had a gun while he was driving in the car. As the PCRA court suggested in its opinion, the most determinative issue of Appellee's guilt was whether the victim pulled out a gun during the confrontation at the apartment complex parking lot, resulting in Appellee acting in self-defense when he shot the victim. PCRA Court Opinion filed 6/28/07 at 20, 27. By Mr. Walker's own admission, Mr. Walker was neither present at the time of the shooting nor in the car with the victim as the victim was driving to the apartment complex's parking lot. Numerous witnesses testified, and the jury apparently found credible, the victim did not have a gun during the incident in the apartment complex parking lot, when Appellee shot the victim, and the victim had held his hands up indicating he wanted a fair fight. In fact, during the course of six days of testimony, with the exception of Appellee's self-serving testimony, not a single eyewit-

---

the district attorney's cross-examination of Attorney Nigrini during the PCRA hearing.

9. *See* PCRA Court Opinion filed 7/25/07 at 1–29.

ness testified that the victim had a gun or weapon of any kind during the apartment complex parking lot incident, the police did not recover a gun from the victim or the surrounding area, and none of witnesses suggested that a gun was removed from either the victim or the surrounding area.

¶ 38 Simply put, the fact the victim may have had a gun while he was in his car driving to the apartment complex does not necessarily establish that he took the gun out of the car during the apartment complex incident or that, if he did so, he had an opportunity to show and use the gun. Mr. Walker's proposed testimony establishes, at most, that the victim told him that he had a gun while the victim was driving in his car, and Mr. Walker warned him not to use the gun or otherwise escalate the situation.

¶ 39 Moreover, assuming Mr. Walker's testimony suggested the victim was carrying a gun during the shooting, the jury was not required to conclude Appellee acted in self-defense. By his own admission, after a physical altercation at the night club with the victim and other people who visited and/or lived in the apartment complex, Appellee went to the apartment complex armed with a gun. When confronted by the victim in the parking lot, Appellee admitted at trial that he did not simply get in his vehicle and drive away, even though the victim was not blocking Appellee's path to the driver's side of his car door. Instead, Appellee essentially indicated he "stood his ground" until he saw the victim grab Leeann Santiago's hair and then reach underneath his shirt for a gun. *See McClendon, supra* (discussing the Commonwealth's burden with regard to provocation and duty to retreat).

¶ 40 For all of the aforementioned reasons, we conclude the PCRA court erred in finding Attorney Nigrini did not have a reasonable basis for not calling Mr. Walker to testify, the absence of Mr. Walker's testimony prejudiced Appellee to the extent the outcome of the proceedings would have been different, and Appellee demonstrated the truth-determining process was undermined such that no reliable adjudication of guilt or innocence could have taken place.[10] As such, we conclude the PCRA court erred in finding Attorney Nigrini to be ineffective on the basis he failed to call Mr. Walker to testify on behalf of Appellee.

¶ 41 However, this does not end our inquiry, as the PCRA court further concluded Attorney Nigrini was ineffective in failing to investigate properly Mr. Walker. Specifically, the PCRA court concluded Attorney Nigrini should not have relied on the information provided to him by the private investigator, Mr. Drey, but should have personally interviewed Mr. Walker. Assuming, *arguendo,* the PCRA court is correct that Attorney Nigrini should have personally interviewed Mr. Walker, we conclude that counsel cannot be ineffective on this basis. Specifically, in light of our conclusion *supra* that Appellee failed to meet his burden of establishing he was prejudiced by the absence of Mr. Walker's testimony, we fail to see how Attorney Nigrini's further investigation of Mr. Walker would have affected the outcome of the proceedings.

¶ 42 Finally, we address the PCRA court's conclusion that a new trial is warranted based on after-discovered evidence in the form of Kelvin Robertson's recanted testimony.

---

**10.** Moreover, Mr. Walker's proposed testimony regarding the antagonistic relationship between the victim and Appellee was testified to by many other witnesses, as was Mr. Walker's proposed testimony that the victim was looking for Appellee.

While [the appellate courts have] often acknowledged the limitations inherent in recantation testimony, we have not foreclosed the possibility that, in some instances, such testimony may be believed by the factfinder and thus form a basis for relief. For this to occur, however, the testimony must be such that it could not have been obtained at the time of trial by reasonable diligence; must not be merely corroborative or cumulative; cannot be directed solely to impeachment; and must be such that it would likely compel a different outcome of the trial. In addition, "an appellate court may not interfere with the denial or granting of a new trial where the sole ground is the alleged recantation of state witnesses unless there has been a clear abuse of discretion."

*Commonwealth v. Williams,* 557 Pa. 207, 231–32, 732 A.2d 1167, 1180 (1999) (quotations and citations omitted). *See Commonwealth v. D'Amato,* 579 Pa. 490, 856 A.2d 806 (2004).

¶ 43 During the PCRA evidentiary hearing, Mr. Robertson, a/k/a "Smack," who was in prison, testified that, on March 11, 2004, he went to the night club with Kevin Harris and met the victim. N.T. 2/22/07 at 62. Mr. Robertson testified that the victim and Appellee exchanged words at the night club and the victim jumped on Appellee. N.T. 2/22/07 at 63. Mr. Robertson denied that, prior to the fight, Appellee was making hand gestures or pointing his finger at the victim. N.T. 2/22/07 at 64. After the bouncers escorted him out of the night club, a friend handed Mr. Robertson a gun. N.T. 2/22/07 at 66. Because he had forgotten his cell phone inside of the night club, Mr. Robertson testified he handed the gun to the victim, and then Mr. Robertson went back into the night club to retrieve his cell phone. N.T. 2/22/07 at 66–67. When he came back outside, the victim had left. N.T. 2/22/07 at 67–68.

Mr. Robertson testified that the victim routinely carried a gun, and he was present when the victim shot at someone on a prior occasion. N.T. 2/22/07 at 68–69. Mr. Robertson indicated that, prior to Appellee's trial, he told the police that he had handed a gun to the victim in the night club parking lot but he never told Attorney Nigrini such information. N.T. 2/22/07 at 71. Mr. Robertson testified that he was not present during the apartment complex parking lot shooting, and, therefore, he did not witness the shooting. N.T. 2/22/07 at 72. He further testified that he neither saw the victim nor removed anything from the victim after the shooting, and he did not observe anyone else removing anything from the victim. N.T. 2/22/07 at 72. On cross-examination, Mr. Robertson confirmed that he does not know whether the victim possessed a handgun at the apartment complex parking lot since he was not in his presence at the time. N.T. 2/22/07 at 75.

¶ 44 In analyzing Mr. Robertson's trial and PCRA hearing testimony, the PCRA court concluded the following:

At trial, Robertson testified that [Appellee] was making gang related gestures towards [the victim] before the fight broke out at the [night club]. At the PCRA hearing, Robertson testified that he was lying about this at trial and did not see [Appellee] make any gang related hand gestures. He claims that he only said that because he was being pressured by Frank Cori, the District Attorney at the time, and by Trooper Andrea Young. Neither side called Mr. Cori or Trooper Young to testify at the PCRA hearing.

Robertson also testified that he gave [the victim] a gun after the fight at the [night club]. He claims that the gun was given to him by Chris, the driver of

the Lincoln Navigator in which he was riding, and that he then handed it to [the victim]. He described the gun as identical to the gun Kevin Harris carried, namely a titanium colored revolver. At trial, [Appellee] identified a silver revolver as the gun he claimed to have seen in [the victim's] waistband in the [apartment complex] parking lot. Robertson claimed to have told Frank Cori about giving [the victim] the gun, but then he was never questioned about it again. He also failed to volunteer the information when being questioned by [Appellee's] trial counsel.

At the PCRA hearing, Robertson also testified that [the victim] often carried a gun.

* * *

Robertson testified [at the PCRA hearing] that he was anxious to give the District Attorney exactly what he wanted, because Robertson had pending drug charges and was hoping to gain leniency on those charges. [Appellee] presented no evidence at the PCRA hearing regarding the disposition of those charges.

By his own admission, Robertson did not hesitate to fashion his trial testimony in a way that he thought would help him with the Commonwealth. His willingness to do so certainly does not enhance his credibility with respect to his current testimony. Standing alone, it would be insufficient to entitle [Appellee] to a new trial; however, his testimo-

ny at the PCRA hearing was corroborated by that given by Achille Walker.

PCRA Court Opinion filed 6/28/07 at 28–30. The PCRA court further reasoned that:

Walker's testimony at the PCRA hearing is corroborated by Robertson's testimony at the PCRA hearing. Robertson now says he gave [the victim] a gun after the fight at the [night club]. Walker says that [the victim] told him he had gotten a gun during their phone conversation while [the victim] was on his way to [the apartment complex].

PCRA Court Opinion filed 6/28/07 at 41.

¶ 45 We find the PCRA court erred in concluding Mr. Robertson's PCRA hearing testimony would have compelled a different outcome at trial. See Williams, supra. At most, Mr. Robertson's PCRA testimony established that Appellee did not "throw" hand signals at the night club, and the victim, who Mr. Robertson knew to carry a gun, had access to a gun after the night club altercation. Regarding the absence of Appellee giving hand signals, which leads to the conclusion the victim was the aggressor at the night club, such testimony would be merely cumulative of other testimony, which was given at trial. See id. Numerous witnesses testified that the victim threw the first punch at Appellee during the night club altercation. As for the fact Mr. Robertson knew the victim often carried a gun and Mr. Robertson handed the victim a gun in the night club parking lot,[11] as with Mr. Walker, Mr. Robertson

11. We note that we further find the PCRA court erred in concluding Mr. Robertson's testimony that he handed a gun to the victim in the parking lot of the night club constitutes "after-discovered" evidence. Mr. Robertson never testified at trial that he did not hand the victim a gun in the night club's parking lot. Rather, as Mr. Robertson explained during the PCRA hearing, he was never questioned at

trial as to whether he gave the victim a gun in the night club's parking lot. In the absence of such questioning by Appellee's counsel, we conclude Mr. Robertson's PCRA hearing testimony regarding Mr. Robertson giving the victim a gun in the night club parking lot could have been obtained at the time of trial by reasonable diligence. See Williams, supra.

admitted at the PCRA hearing that he was neither present in the vehicle with the victim as he was driving to the apartment complex nor at the apartment complex parking lot when the shooting occurred. That is, while Mr. Robertson's PCRA hearing testimony could have established at trial that the victim had access to a gun at some point during the evening, his testimony would not have established that the victim used the gun or was even carrying the gun at the apartment complex. As indicated *supra*, during the course of six days of testimony, with the exception of Appellee's self-serving testimony, not a single eyewitness testified that the victim had a gun at the time of the shooting, the police did not recover a gun from the victim or the surrounding area, and none of the witnesses suggested that a gun was removed from either the victim or the surrounding area. Moreover, assuming, *arguendo,* Mr. Robertson's PCRA testimony would have suggested the victim was carrying a gun, for the reasons discussed *supra*, the jury still could have concluded the Commonwealth met its burden of proving Appellee's shooting of the victim was not justifiable self-defense. *See McClendon, supra.*

¶ 46 For all of the foregoing reasons, we conclude the PCRA court erred in granting Appellee's PCRA petition, vacating Appellee's judgment of sentence, and directing a new trial. Therefore, we reverse and remand for further proceedings consistent with this decision.

¶ 47 Order Reversed; Judgment of Sentence Reinstated; Motion to Quash Denied; Motion to Dismiss Denied; Jurisdiction Relinquished.

¶ 48 HUDOCK, J. FILES A DISSENTING OPINION.

DISSENTING OPINION BY HUDOCK, J.:

¶ 1 The PCRA court concluded that counsel was ineffective in failing to investigate and call an available witness. The PCRA court also found that after-discovered evidence, in the form of recantation testimony by a Commonwealth witness, and some additional testimony by that witness favorable to Appellee, justified the granting of a new trial. The Majority rejects the PCRA court's reasoned assessment concluding that counsel had a reasonable strategic basis for failing to call the witness in question and that Appellee did not establish prejudice with respect to the after-discovered testimonial evidence. I find myself in disagreement with the Majority's position, thus, I respectfully dissent.

¶ 2 At issue in the ineffectiveness claim relating to counsel's failure to investigate and call an available witness was the proposed testimony of Achille Walker. Mr. Walker was a friend of the decedent's and actually lived with the decedent for a period of time. As fortune would have it, Mr. Walker received a call from the decedent after the incident at the Live Wire and while the decedent was driving in his car *en route* to his fateful meeting with Appellee. According to his testimony at the PCRA hearing, in the course of their conversation, the decedent stated to Mr. Walker that he had beaten up Appellee and that he was not finished and was "going to go get him again." N.T. PCRA Hearing, 2/22/07, at 84. Mr. Walker then told the decedent to "leave it alone," warning him that Appellee had a license to carry a gun. *Id.* According to Mr. Walker, in response to this statement, the decedent reportedly indicated that he had gotten his own gun back. Mr. Walker paraphrased the decedent as saying, "I don't care. I

got my own back." [12] *Id.*

¶ 3 The PCRA court concluded that counsel was ineffective in failing to interview and call Mr. Walker, who indicated that he had related the above to the private investigator retained to assist in Appellee's defense. Despite Mr. Walker relating the details of his conversation with the decedent to the investigator, Appellee's trial counsel did not conduct a personal interview of Mr. Walker and did not call him as a witness. The PCRA court further concluded that Mr. Walker's testimony would have been relevant and helpful to the defense to establish that the decedent possessed a gun in the critical moments leading up to the shooting. This evidence also would have been relevant and helpful to refute the numerous witnesses who testified that they had never seen the decedent carrying a gun, as the statement "I got my own back" implies that he had had a gun previously.

¶ 4 Trial counsel provided two reasons for not interviewing Mr. Walker or calling him to testify. Trial counsel postulated that, as Mr. Walker was not present at the scene of the shooting, he could not "place a gun" in the decedent's hands. Trial counsel further opined that, as Mr. Walker had pending charges for drug trafficking, this fact would have weighed against his credibility. As the PCRA court concluded that the testimony would have been relevant to establish the decedent's possession of a gun shortly before the shooting, it rejected counsel's first basis. While Mr. Walker's testimony would not necessarily place a gun in the decedent's hands at the time of the shooting, it certainly would have acted to bolster Appellee's claim that the decedent was, in fact, armed. As for the credibility claim, the court found that counsel's concern was unfounded because numerous Commonwealth witnesses also had pending drug charges, and the natural bias for one having pending charges is toward the Commonwealth. The bias toward the Commonwealth arises due either to the fact the Commonwealth is in a position to ask for favorable treatment should the witness provide helpful cooperation, or due to the fact that few would want to antagonize the Commonwealth by testifying against their position while one is himself awaiting disposition of criminal charges.

¶ 5 The Majority concludes the PCRA court erred with respect to Mr. Walker, as counsel had a strategic basis for not calling the witness. The Majority also implies

---

12. The whole of Mr. Walker's testimony casts doubt upon the idea that he was attempting to quote the decedent verbatim. The following passage demonstrates this point:

A. Well, it was about like during the time me and your client was going through a little personal something and me and [the decedent] being friends, like I said, we had a conversation inside the mall. We were in the mall and we were talking about, you know, him and Dez going through it. They're arguing about the girl, Leeann. They were arguing over her. So she—he tells me, he's like, look, I'm going to do such and such. You know, he keeps running his mouth about me.

Q. When you go back, you got to be clear for the court. When he said such—what is such and such? Do you remember?

A. Well, he said when he sees Dez it's going to be problems.

N.T. PCRA Hearing, at 82–83. The passage referencing the decedent's reacquisition of a gun has a similar feel to it:

A. Well, he says—he says to me, look, I don't care. I got my own back. I was like well, just leave it alone.

Q. Lets' stop there. He tells you he got his gun back?

A. Yeah.

*Id.* at 84. Although Mr. Walker did not use the word gun, when asked about the decedent getting his gun back he responded affirmatively. This leaves open the question whether the decedent actually used the term "gun" or whether Mr. Walker simply construed what the decedent stated to mean that he had gotten the gun back

that Appellee failed to establish prejudice from the failure to call Mr. Walker. As outlined above, the PCRA court addressed the strategic basis argument and found it lacking. I join in this assessment. While a reasonable trial strategy will not be second guessed by the PCRA court, I see no reasonable basis for failing to interview and call Mr. Walker. First, it should be noted that neither trial counsel nor the Majority established a negative effort from calling Mr. Walker. Nor does trial counsel or the Majority establish an alternative strategy counsel pursued that precluded the calling of Mr. Walker. Mr. Walker's testimony, in fact, was consistent with the defense theory that Appellee acted in self-defense, as the decedent was armed and appeared to be reaching for his gun when Appellee shot him. Thus, calling Mr. Walker was not mutually exclusive to another tact taken by counsel designed to advance Appellee's defense. As the trial court correctly assesses, "[a]t worst, the jury would simply not have believed him." Trial Court Opinion, 6/28/07, at 36.

¶ 6 I have further reason to conclude that counsel's decision to not call Mr. Walker was not the product of a reasoned trial strategy. Trial counsel's testimony at the PCRA hearing seemingly reflects a retrospective rationalization of his decision rather than divulging his thinking at the time of trial. Counsel states:

> I don't believe, based upon what I had, he actually places a gun in the hands of [the decedent.] There was some talk about being able to get a gun prior to this date from, I believe Smack, but I don't believe based upon his interview that he physically put a gun in his hand and considering I think he was incarcerated at the time facing charges. You know, there certainly could be the express bias towards the District Attorney's Office. So I believe that was the tactical reason for not calling him.

N.T. PCRA Hearing, at 25. It appears to me that the above passage demonstrates counsel's **presumption** that Mr. Walker would not testify favorably to Appellee, thus giving counsel a reason to forego even interviewing Mr. Walker. I cannot accept this as a basis for failing to personally interview Mr. Walker to determine that to which he was actually willing to testify.

¶ 7 Further, the usage of the phrase, "I believe that was the tactical reason," also seemingly reflects counsel's thinking after the fact why he might not have called Mr. Walker, not a reasoned decision that occurred at the time of pre-trial strategizing. In short, I agree with the PCRA court that counsel possessed no reasonable trial strategy for foregoing the potentially useful testimony of Mr. Walker. Further, like the PCRA court, I believe Mr. Walker's testimony satisfies the relevancy standard. "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Commonwealth v. Stallworth*, 566 Pa. 349, 781 A.2d 110, 117–118 (2001). Here, by establishing that the decedent was in possession of a gun immediately prior to the confrontation with Appellee, particularly with the additional evidence that the decedent was seeking to track Appellee down, a reasonable inference is created that the decedent was armed at the time in question. Certainly, Appellee's theory of the case is bolstered by this evidence.

¶ 8 While the matter was not addressed at the time of the PCRA hearing, in a motion for reconsideration the Commonwealth objected to the proposed testimony on hearsay grounds. In denying reconsideration, the PCRA court found the statement of the decedent "I got my own back" would be admissible pursuant to one or

more hearsay exceptions: excited utterance, present sense impression or state of mind exception. I have doubts that any of these three exceptions would apply to the statement in question,[13] but at issue presently is the PCRA court's initial order granting relief, an order decided without any hearsay argument/objection expressed by the Commonwealth at the time of the hearing. Since the Commonwealth did not argue that the passage would have been inadmissible due to hearsay, it is difficult to conclude that the court erred in granting relief upon this basis. Additionally, there are other portions of Mr. Walker's putative testimony, which I believe would be admissible at trial, that are equally beneficial to Appellee even if the statement that the decedent had regained possession of his weapon was to be precluded.

¶ 9 According to Mr. Walker, after administering a beating to Appellee, the decedent expressed his intent to pursue Appellee further. The decedent reportedly stated, "I'm going to go get him again." This demonstrates the decedent's state of mind, specifically his great anger and animosity toward the Appellee, and, in my opinion, would be admissible under the state of mind exception to the hearsay rule.[14] This testimony by Mr. Walker would bolster Appellee's claim that the decedent was the aggressor in the incident. Mr. Walker also related a discussion with the decedent a few days prior to the shooting in which he similarly indicated that when he saw Appellee, "it's going to be problems." N.T., PCRA Hearing, at 83. Thus, even assuming that the portion of the decedent's statement admitting to getting his gun back might be precluded from admission at retrial, the testimony of Kelvin Robertson (to be discussed *infra* ), would have the same or similar effect as Mr. Walker's testimony. However, what would be gained from the other admissible statements is independent evidence from an admitted friend of the decedent that the decedent expressed his intent to go "get Appellee again," which further dovetailed with threats made a few days earlier. The Commonwealth's theory of the case—and the manner in which Appellee was portrayed—was that of an individual walking through the parking lot of the housing complex looking for individuals to shoot. In short, the Commonwealth portrayed Appellee as a man possessed with revenge hunting down the decedent. The above-discussed evidence would have had great relevance to Appellee's defense, which contended it was, in fact, the decedent doing the "hunting" of Appellee, and not the other way around.

¶ 10 The testimony/recantation testimony of Kelvin Robertson was the second

---

**13.** I express no opinion as to whether the testimony might be admissible under another exception to the hearsay rule not propounded and litigated.

**14.** This hearsay exception provides:
   **Rule 803. Hearsay exceptions; availability of declarant immaterial**
   The following statements, as hereinafter defined, are not excluded by the hearsay rule, even though the declarant is available as a witness:

   \*    \*    \*

   (3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health. A statement of memory or belief offered to prove the fact remembered or believed is included in this exception only if it relates to the execution, revocation, identification, or terms of declarant's will.

basis for the PCRA court granting Appellee a new trial. At the PCRA hearing, Mr. Robertson, a/k/a/ "Smack," who, like Achille Walker, was a friend of the decedent's, testified that his trial testimony had been false to the extent he had indicated that Appellee made threatening hand gestures (imitating the shape of a hand gun) toward the decedent at the Live Wire nightclub prior to the altercation. More importantly, Mr. Robertson testified that, after the fight occurred at the Live Wire, he handed a firearm to the decedent and also that the decedent frequently carried a gun. This testimony corresponds with and supports the testimony of Mr. Walker discussed above. Certainly, the combination of the two accounts substantially bolsters Appellee's claim that the decedent was armed at the scene.

¶ 11 The Majority finds error on the part of the PCRA court because it concludes that the evidence regarding hand gestures was cumulative of other evidence and that the testimony would not establish that the decedent actually possessed the handgun at the scene. While the testimony of Mr. Robertson would not place the gun in decedent's hands at the scene, it certainly makes the proposition much more likely and counters the Commonwealth's testimony that not only was the decedent not seen with a gun, but that he was not known to carry a gun. As such, this evidence satisfies the test of relevancy set forth above. In reality, both sides here are relying upon inference. The fact that other witnesses at the scene did not see the decedent with a handgun does not prove conclusively that the decedent was unarmed, nor does the Commonwealth's evidence to the effect that the decedent was not known to carry a handgun establish that the decedent was not carrying one at the time of the shooting. Rather, the Commonwealth relies upon the above to create an inference that the decedent was, in fact, unarmed.

¶ 12 Conversely, Appellee, through evidence that the decedent claimed he got his gun back, through statements that he was looking to go get Appellee again, and the fact that he was handed a gun outside the Live Wire, seeks to imply that the decedent was, in fact, armed at the time of the incident. To the extent the Commonwealth is entitled to create the favorable inference in this manner, Appellee is equally entitled to rebut that inference. The crux of the matter is highlighted in the Majority's statement, "during the course of six days of testimony, with the exception of Appellee's self-serving testimony, not a single eyewitness testified that the victim had a gun at the time of the shooting...." Majority Opinion, at 563. This is precisely the point; Appellee's testimony naturally would be viewed as self-serving, which is why it is essential to his case to have some corroborating evidence from less interested or wholly disinterested parties. Evidence that tended to make Appellee's testimony far more credible in this regard did exist, which the jury did not hear. Moreover, this testimonial evidence came from friends of the decedent who, one would think, would have no interest in helping Appellee. This is the basis for the PCRA court's decision to grant relief, and I concur with that rationale.

¶ 13 The Majority argues, in part, that prejudice is lacking to Appellee because the jury could have concluded that the Commonwealth had met its burden of proving that Appellee's shooting of the victim was not justifiable self-defense. Majority Opinion, at 563. The fact that the jury **could have** found that the Commonwealth sufficiently disproved Appellee's self-defense theory misdirects the inquiry. The question is not whether the jury could have so found, but whether they

could have found the shooting justifiable and whether the additional evidence helps support that theory. Earlier in its Opinion, the Majority, alluding to the requirement of self-defense that one has a duty to retreat, if retreat was possible with complete safety, suggests that Appellee could not establish self-defense because he did not jump into his car and leave the scene. The Majority's position ignores Appellee's testimony that everything "moved so fast." N.T. Trial, 3/17–24/05, at 993. This position further ignores the fact that Appellee would not have realized that the decedent was about to use deadly force until he began to reach for his handgun. At that point, it would have been too late to retreat with safety.

¶ 14 Moreover, if Appellee is believed, he neither provoked nor continued the use of force. While Appellee and the decedent were in a fight earlier, that fight was broken up and both parties left each other's company. Only later did the two meet up again and, if Appellee's evidence is believed, this encounter resulted when the decedent pursued Appellee with malicious intent. In short, if the jury credited Appellee's evidence and believed the expected testimony which was not presented, Appellee would have established that the killing was a justifiable homicide. Thus, the lack of the above-discussed evidence was indeed prejudicial to Appellee, as the evidence was crucial enough that its absence so undermined the truth-determining process that no reliable adjudication of Appellee's guilt or innocence could have taken place at trial. For the above reasons, I believe that the PCRA court correctly determined that Appellee satisfied the requirements for obtaining relief under the PCRA and is entitled to a new trial. Thus, I dissent.